# CIVIL COVER SHEET

...Il cover sheet and the information contained herein neither replace nor supplement the filing and service of
as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in
...ber, 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE
...ERSE OF FORM.)

**(a)  PLAINTIFFS**
Syed Raza Bokhari, M.D., M.B.A.

**DEFENDANTS**
Lakewood Pathology Associates, Inc.; Lakewood Holding Corp.;
LHC Holding, LLC; Water Street Healthcare Partners, LLC, f/k/a
Water Street Capital Partners, LLC; Harreld N. "Kip" Kirkpatrick, III;
James Connelly; Timothy A. Dugan and Douglas Berg

**(b)**  County of Resident of First Listed - Delaware County, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of Defendant - Ocean County, New Jersey
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE OF THE LAND INVOLVED

**(c)**  ATTORNEYS (FIRM NAME AND TELEPHONE NUMBER)
Suzanne Ilene Schiller/Andrew J. DeFalco
SPECTOR GADON & ROSEN, PC
1635 Market Street, 7th Floor, Philadelphia, PA  19103
215.241.8809 (direct) --- 215.241.8844 (fax)

ATTORNEYS IF KNOWN:

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of
Parties in Item III

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One box for
Plaintiff and one Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign County | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-- | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury-- | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 820 Copyrights | ☐ 810 Selective Services |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 830 Patent | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | | 12 USC 3410 |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards | | ☐ 892 Economic Stabilization |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | Act | ☐ 861 HIA (1395ff) | Act |
| | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| | | | & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Equal Access to |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | or Defendant | ☐ 950 Constitutionality of |
| | | ☐ 550 Civil Rights | | ☐ 871 IRS–Third Party | State Statutes |
| | | ☐ 555 Prison Condition | | 26 USC 7609 | ☐ 890 Other Statutory Actions |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332 Diversity – Breach of Contract/Direct Action by Shareholder of Corporation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A  CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $15,000,000

CHECK YES only if demanded in

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY (See instructions): None

| JUDGE | DOCKET NUMBER |
|---|---|

DATE
November 28, 2007

SIGNATURE OF ATTORNEY OF RECORD
SIS88          Suzanne Ilene Schiller, Esquire (I.D. No. 68206)

Receipt #_____   Amount _____   Applying IFP _____   Judge _____   Mag. Judge _____

388780-1

**UNITED STATES DISTRICT COURT**                                          **APPENDIX F**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: 437 N. Spring Mill Road, Villanova, Pennsylvania 19085

Address of Defendant:   Lakewood Pathology Associates, Inc.: home office and principal place of business located at 1200 River Drive, Building 10, Lakewood, New Jersey 08701; Lakewood Holding Corp.: registered office located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904, principal place of business located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220; LHC Holding, LLC: registered office located at 160 Greentree Drive, Suite 1620, Chicago, Illinois 60606-1220; Water Street Healthcare Partners, LLC, f/k/a Water Street Capital Partners, LLC: registered office located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 18901, and principal place of business located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220; Harreld N. "Kip" Kirkpatrick, III; James "Jim" Connelly and Timothy A. Dugan have a business address located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220; and Douglas Berg has a business address located at 1200 River Drive, Building 10, Lakewood, New Jersey 08701.

Place of Accident, Incident or Transaction: Pennsylvania, Chicago and New Jersey
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))                Yes ☒   No ☐

Does this case involve multidistrict litigation possibilities?                Yes ☐   No ☒

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                Yes ☐   No ☒

____CIVIL: (Place __ in ONE CATEGORY ONLY)

| A. *Federal Question Cases:* | B. *Diversity Jurisdiction Cases:* |
|---|---|
| 1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts | 1. ☒ Insurance Contract and Other Contracts |
| 2. ☐ FELA | 2. ☐ Airplane Personal Injury |
| 3. ☐ Jones Act-Personal Injury | 3. ☐ Assault, Defamation |
| 4. ☐ Antitrust | 4. ☐ Marine Personal Injury |
| 5. ☐ Patent | 5. ☐ Motor Vehicle Personal Injury |
| 6. ☐ Labor-Management Relations | 6. ☐ Other Personal Injury (Please specify) |
| 7. ☐ Civil Rights | 7. ☐ Products Liability |
| 8. ☐ Habeas Corpus | 8. ☐ Products Liability — Asbestos |
| 9. ☐ Securities Act(s) Cases | 9. ☐ All other Diversity Cases |
| 10. ☐ Social Security Review Cases | (Please specify) |
| 11. ☒ All other Federal Question Cases (Please specify) Lanham Act | |

## ARBITRATION CERTIFICATION--*(Check appropriate Category)*

I, Suzanne Ilene Schiller, Esquire, counsel of record do hereby certify:

☒   Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐   Relief other than monetary damages is sought.

DATE: __November 28, 2007__                    _____SIS88_____
                                               Attorney-at-Law  Suzanne Ilene Schiller

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.**

DATE: __November 28, 2007__                    _____SIS88_____
                                               Attorney-at-Law  Suzanne Ilene Schiller

356036-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SYED RAZA BOKHARI, M.D., M.B.A., <br> v. <br> LAKEWOOD PATHOLOGY ASSOCIATES, INC.; LAKEWOOD HOLDING CORP.; LHC HOLDING, LLC; WATER STREET HEALTHCARE PARTNERS, LLC, F/K/A WATER STREET CAPITAL PARTNERS, LLC; HARRELD N. "KIP" KIRKPATRICK, III; JAMES CONNELLY; TIMOTHY A. DUGAN AND DOUGLAS BERG | Case No. |

## CASE MANAGEMENT DESIGNATION FORM

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)   Habeas Corpus -- Cases brought under 28 U.SC. §2241 through §2255.   ( )

(b)   Social Security -- Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c)   Arbitration -- Cases required to be designated for arbitration under Local Civil Rule 53.2   ( )

(d)   Asbestos -- Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e)   Special Management -- Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See revise side of this form for a detailed explanation of special management cases.)   ( )

(f)   Standard Management -- Cases that does not fall into any one of the other tracks.   ( xx )

| | | |
|---|---|---|
| _11/28/2007_ | _Suzanne Ilene Schiller, Esq._ | _Syed Raza Bokhari, M.D._ |
| Date | Attorney-at-law | Attorney for |
| _(215) 241-8888_ | _(215) 241-8844_ | sschiller@lawsgr.com |
| Telephone | FAX Number | E-mail Address |

284662-1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SYED RAZA BOKHARI, M.D., M.B.A.,<br><br>v.<br><br>LAKEWOOD PATHOLOGY ASSOCIATES, INC.; LAKEWOOD HOLDING CORP.; LHC HOLDING, LLC; WATER STREET HEALTHCARE PARTNERS, LLC, F/K/A WATER STREET CAPITAL PARTNERS, LLC; HARRELD N. "KIP" KIRKPATRICK, III; JAMES CONNELLY; TIMOTHY A. DUGAN AND DOUGLAS BERG | Case No. |
| | |

## COMPLAINT

Plaintiff, Syed Raza Bokhari, M.D., M.B.A. ("Dr. Bokhari"), by and through his undersigned counsel, states the following as his Complaint against the Defendants:

## INTRODUCTION

1.     This is a direct action seeking equitable relief and damages arising out of Defendants' wrongful coercion and willful breach of fiduciary obligations owed directly to the Plaintiff, Dr. Bokhari, which caused special and unique harm to Dr. Bokhari, occurring after May 16, 2007.

2.     At all times prior to October, 2007, Dr. Bokhari was the holder of certain shares of preferred and common stock in Lakewood Holding Corporation, amounting to a 33% beneficial interest in Lakewood Holding (the sole purpose of which was to serve as the holding company of Lakewood Pathology Associates, Inc., a national pathology company providing a full range of anatomical pathology services). Recently, Lakewood Holding, through its majority shareholder, LHC Holding, LLC, a wholly owned

subsidiary of Water Street Capital Partners, LLC, and holder of an approximately 58%

controlling interest in Lakewood Holding, and through the four Directors employed by

and controlled by Water Street, engineered a recapitalization transaction that has forcibly

extinguished and extracted 100% of Dr. Bokhari's voting power and economic interest in

Lakewood Holding, while resting complete control over Lakewood Holding in the hands

of its majority shareholders, LHC Holding/Water Street, and dramatically increasing the

management fees and transaction fees paid to Water Street as a way to provide a

preferential return on its investment (the "Recapitalization Transaction").  The

Recapitalization Transaction was actionably coercive, and the product of wrongful and

unfair self-dealing by various officers, directors and controlling shareholders of

Lakewood Holding, in breach and in derogation of their fiduciary duties to Lakewood

Holding's primary minority shareholder, Dr. Bokhari.

      3.     Importantly, four of Lakewood Holding's five Directors, who engineered

the Recapitalization Transaction, stood on both sides of the Recapitalization Transaction

as they were employed by Water Street and, while purporting to act in the best interest of

Lakewood Holding, constructed a transaction that bestowed a windfall onto the majority

shareholder, Water Street.  At the same time, the Recapitalization Transaction destroyed

both the economic value and the voting power of the minority shareholder, Dr. Bokhari.

This is the very definition of the term "self-dealing" and a fundamental breach of the

duties of loyalty, care, fairness and good faith owed by the Water Street Directors and

Water Street to Dr. Bokhari.

      4.     Further, the Recapitalization Transaction was undeniably egregiously and

actionably coercive.  The Recapitalization Transaction offered Dr. Bokhari, a 33%

shareholder in Lakewood Holding and, indirectly, the owner of a 33% interest in Lakewood Pathology, the opportunity to participate in an "equity issuance" whereby he could participate pro-rata, based on his stock ownership, in a $5 million equity investment and a $5 million guaranty of Lakewood Pathology's existing indebtedness, where each stockholder "shall be required to guarantee an amount of Lakewood Pathology's indebtedness … equal to the amount of his or its investment."  The new stock issued from the Recapitalization Transaction would represent ownership of 100% of the economic value of Lakewood Pathology, and would rank senior to all outstanding classes of stock.  Importantly, Water Street worked into the deal exorbitant transaction fees and management fees (constituting a preferential return on its investment) which would effectively pay Water Street back in cash for the equity invested, but would not pay back Dr. Bokhari.   Thus, for Water Street, the transaction was "heads I win, tails you lose:"  either Water Street would obtain sole ownership of Lakewood Holding/Lakewood Pathology if Dr. Bokhari chose not to participate or Water Street would continue in its controlling ownership position using additional capital effectively invested solely by Dr. Bokhari without increasing Dr. Bokhari's interest in the Lakewood entities.

5.      Thus, by fiat, Water Street forced Dr. Bokhari to either (1) lose his entire interest in Lakewood Holding/Lakewood Pathology that he retained when Water Street purchased a controlling interest in Lakewood Holding/Lakewood Pathology, or (2) re-invest in Lakewood Holding/Lakewood Pathology capital that he was previously paid to relinquish a controlling interest in Lakewood Pathology, on unequal terms with the controlling shareholder, with no increased equity in Lakewood Holding/Lakewood Pathology.  This is the very definition of an unfair and unlawful coercive transaction, as

3

the Water Street Directors' decision to engage in the Recapitalization Transaction

unfairly impacted and strong-armed Dr. Bokhari, for reasons outside of the economic

merit of the transaction, to either engage in the transaction or lose his entire interest.

      6.      Further, the Recapitalization Transaction was based on one fundamentally

absurd premise: that Lakewood Pathology, the same company that Water Street valued in

May 2006 to be worth $50 million, had no value whatsoever as of September 2007,

despite the fact that the revenues of Lakewood Pathology in September 2007 were greater

than its revenues in May 2006.  Therefore, the Recapitalization Transaction is, quite

simply, nothing more than a sham and pretext for the Directors controlled by Water

Street to pass along complete control over Lakewood Holding/Lakewood Pathology to

Water Street, and to squeeze Dr. Bokhari out of the company.

## JURISDICTION AND VENUE

      7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332,

because the amount in controversy in this matter exceeds $75,000, exclusive of interests

and costs, and this matter is between citizens of different states.

      8.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, because a

substantial part of the events or omissions giving rise to this claim occurred in this

judicial district and Defendant Lakewood Pathology maintains a facility in this judicial

district.

## THE PARTIES

      9.      Dr. Bokhari is an adult individual and a resident of Pennsylvania, with a

home address located at 437 N. Spring Mill Road, Villanova, Pennsylvania 19085.  In

2006, Dr. Bokhari sold an approximately 65% interest in Lakewood Pathology to LHC

Holding, LLC, a wholly owned subsidiary of Water Street Healthcare Partners, LLC, and retained an approximately 35% interest.  As discussed in this Complaint, the interest retained by Dr. Bokhari has been destroyed by the unfair and coercive tactics of Water Street and the Board of Directors controlled by Water Street.

10.     Lakewood Pathology Associates, Inc. ("Lakewood Pathology") is a New Jersey Corporation with a home office and principal place of business located at 1200 River Drive, Building 10, Lakewood, New Jersey 08701.  Lakewood Pathology also has an office located at 1001 Conshohocken State Road, Suite 101, West Conshohocken, Pennsylvania 19428.

11.     Lakewood Holding Corp. ("Lakewood Holding") is a Delaware Corporation with a registered office located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904, and a principal place of business located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220.

12.     LHC Holding, LLC ("LHCH") is a Delaware Limited Liability Company with a registered office located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904, and a principal place of business located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220.  LHCH is a wholly owned subsidiary of Water Street Healthcare Partners, LLC, and since May 2006 has been the owner of a controlling interest in Lakewood Holding Corp.

13.     Water Street Healthcare Partners, LLC, f/k/a Water Street Capital Partners, LLC, is a Delaware Limited Liability Company with a registered office located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 18901, and a

principal place of business located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220.

14.     Defendant Harreld N. "Kip" Kirkpatrick, III ("Kirkpatrick") is an adult individual and a resident of the State of Illinois, with a business address located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220.  Kirkpatrick founded Water Street Healthcare Partners, LLC in 2005, and has been a partner in Water Street Healthcare Partners, LLC ever since.  After Water Street purchased its interest in Lakewood Holding/Lakewood Pathology, Kirkpatrick served on the Board of Directors of Lakewood Holding/Lakewood Pathology, and was named Chairman of the Board.

15.     Defendant James "Jim" Connelly ("Connelly") is an adult individual and a resident of the State of Illinois, with a business address located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220.  Connelly has at all times material been a partner in Water Street Healthcare Partners, LLC.  After Water Street purchased its interest in Lakewood Holding/Lakewood Pathology, Connelly served on the Board of Directors of Lakewood Holding/Lakewood Pathology.

16.     Defendant Timothy A. Dugan ("Dugan") is an adult individual and a resident of the State of Illinois, with a business address located at 333 West Wacker Drive, Suite 1620, Chicago, Illinois 60606-1220.  Dugan has at all times material been a partner in Water Street Healthcare Partners, LLC.  After Water Street purchased its interest in Lakewood Holding/Lakewood Pathology, Dugan served on the Board of Directors of Lakewood Holding/Lakewood Pathology.

17.     Defendant Douglas Berg ("Berg") is an adult individual and a resident of the State of California, with a business address located at 1200 River Drive, Building 10,

6

Lakewood, New Jersey 08701.  Berg was engaged by Water Street to perform all due diligence respecting the purchase of Water Street's interest in Lakewood Pathology. After Water Street purchased its interest in Lakewood Holding/Lakewood Pathology, Water Street installed Berg as a Member of the Board of Directors.  Subsequently, in January 2007, Berg was installed as the Chief Development Officer of Lakewood Pathology, and resigned from the Board of Directors.  In May 2007, Water Street made Berg the Chief Executive Officer of Lakewood Holding/Lakewood Pathology, and was re-installed on the Board of Directors.

18.     For ease of reference, where appropriate, Defendants LHC Holding, LLC and Water Street Healthcare Partners, LLC, f/k/a Water Street Capital Partners, LLC will be referred to herein as "Water Street."  Also, Defendants Kirkpatrick, Connelly, Dugan and Berg will be referred to herein as the "Water Street Directors."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

19.     By reason of their positions as directors, and in some cases officers, of Lakewood Pathology and Lakewood Holding, and their statutory power to control the business and corporate affairs of Lakewood Pathology and Lakewood Holding, the Water Street Directors owed to Lakewood Pathology and Lakewood Holding's shareholders the fiduciary obligations of fairness, good faith, loyalty and due care, and were and are required to use their utmost ability to control and manage Lakewood Pathology and Lakewood Holding in a fair, just, honest, and equitable manner. The Water Street Directors were and are required to act in furtherance of the best interests of Lakewood Pathology and Lakewood Holding's shareholders and not in furtherance of their personal interest or benefit, or in furtherance of the interest and benefit of Water Street, at the

7

expense and to the detriment of the shareholders of Lakewood Pathology and Lakewood Holding and, in particular, the single largest minority shareholder, Dr. Bokhari.

20.     The Water Street Directors used their positions of control and authority as directors and/or officers of Lakewood Pathology and Lakewood Holding to approve and effectuate the wrongful acts complained of herein.

21.     As alleged in detail below, the Water Street Directors breached their duties of loyalty and good faith by, inter alia, standing on both sides of the Recapitalization Transaction, engineering the wrongful and coercive Recapitalization Transaction aimed solely to benefit their employer, Water Street, at the expense of the largest minority shareholder, Dr. Bokhari, and ultimately, following through with the Recapitalization Transaction which eviscerated Dr. Bokhari's interest.

## WATER STREET STOOD ON BOTH SIDES OF THE RECAPITALIZATION TRANSACTION

22.     As discussed in greater detail below, the Water Street Directors plainly stood on both sides of the Recapitalization Transaction, and cannot establish that the Recapitalization Transaction was anything but an unfair breach of their duties of fairness, loyalty, good faith and due care.

23.     Of the four Water Street Directors, three (Dugan, Connelly and Kirkpatrick) have at all times material been principals and partners in Water Street Healthcare Partners, LLC and its subsidiaries, including, but not limited to, LHCH, the controlling shareholder of Lakewood Holding and Lakewood Pathology.  Berg, while not a partner of Water Street, was employed as a consultant by Water Street prior to the purchase of its interest in Lakewood Pathology, and was wholly controlled by Water Street.

8

24.     In fact, as discussed below, the Water Street Directors expressly and in writing acknowledged their conflict of interest with respect to the Recapitalization Transaction.

## CONTROL BY WATER STREET AND DIRECT HARM TO DR. BOKHARI

25.     The conduct of Water Street Directors caused an improper transfer of both economic value and voting power from the minority shareholder, Dr. Bokhari, to the controlling stockholder, Water Street.  By virtue of Water Street's control over, at a minimum, four (4) of the five (5) Directors on the Board of Directors of Lakewood Holding/Lakewood Pathology, Water Street dominated Lakewood Holding/Lakewood Pathology, and was able to manipulate the corporate processes to engineer a transaction whereby Water Street received an exclusive benefit of increased equity ownership and voting power for inadequate consideration, and granted itself lavish cash payments for no value received in the process, as a preferential return on Water Street's investment.

26.     Conversely, as to Dr. Bokhari, his 33% interest in Lakewood Holding/Lakewood Pathology was uniquely damaged by virtue of the expropriation of voting power represented by his interest in the companies, and economic value of his shares, for the benefit of Water Street, accomplished by the controlling shareholder, Water Street.  Indeed, the Recapitalization Transaction constitutes an unfair extraction of both equity ownership and voting power from the largest minority shareholder of Lakewood Holding/Lakewood Pathology, Dr. Bokhari, and a redistribution to the controlling shareholder of the economic value and voting power embodied in Dr. Bokhari's interest.  As a consequence, Dr. Bokhari has been harmed, uniquely and individually, to the same extent (and indeed, to a greater extent) that Water Street has

9

benefited.  Therefore, Dr. Bokhari is entitled to recover the value represented by the evisceration of his shares, individually.

27.     It is not and cannot be disputed that Water Street was the controlling shareholder of Lakewood Holding/Lakewood Pathology at all times material.  At the time of the Recapitalization Transaction, Water Street, through its wholly owned subsidiary LHCH, owned 361,081 fully diluted shares of Lakewood Holdings, for a 58.4% interest in Lakewood Holdings and its subsidiary, Lakewood Pathology.  This is in addition to the stock owned by Water Street's Operating Partners, Kevin Swan and Al Heller, and the unvested, restricted interests of Timothy Brodnik and Douglas Berg, who were affiliated with Water Street and placed on the Board of Directors by Water Street.

## DAMAGES

28.     Dr. Bokhari demands rescissory damages and equitable damages for unjust enrichment to recoup the fair value of the interest that was taken from him.

29.     Dr. Bokhari is entitled to the entire value of his 33% interest in Lakewood Holdings had the Water Street Directors not breached their fiduciary duties through the Recapitalization Transaction.  Dr. Bokhari's remaining interest was valued at approximately $14 million in May 2006, and that valuation remains appropriate.

30.     Dr. Bokhari is entitled to further damages for the actual and anticipatory breaches of contract detailed below.

31.     Moreover, based on the bad faith of the defendants, Dr. Bokhari is entitled to an award of attorney's fees and costs, as well as punitive damages.

10

## RELEVANT TIME PERIOD

32.     This Complaint seeks recovery for conduct by the Defendants that occurred after May 16, 2007.  To the extent that there are facts in this Complaint relating to events that occurred prior to May 16, 2007, those facts are included for background only, and do not form part of the facts underlying this cause of action.  Further, obligations contained in certain Agreements dated May 18, 2007, April 2, 2007 and May 16, 2007, to the extent that such obligations still exist, remain at issue.

## FACTUAL AND PROCEDURAL BACKGROUND

33.     Dr. Bokhari has a Doctor of Medicine degree from the University of Punjab, Rawalpindi Medical College, and an Executive MBA from Temple University, Fox School of Business & Management.  Born in Pakistan, and having moved to the United States in 1991 at the age of 24, Dr. Bokhari soon established himself as a nationally known entrepreneur, medical professional and philanthropist, all before he reached the age of 40.

**A.     Dr. Bokhari Saves Lakewood Pathology, And Turns It Into An Industry Leader**

34.     In 2000, having already developed a reputation as an entrepreneur capable of turning around struggling companies, Dr. Bokhari was contacted by the then-owner of Lakewood Pathology, a provider of surgical pathology services, which involve examining body tissues as a way to study disease at a cellular level.  At the time, Lakewood Pathology was in severe financial distress, and Dr. Bokhari was asked to consult on the liquidation of Lakewood Pathology.  Instead of consulting on the liquidation, Dr. Bokhari embarked on a path to save the company by becoming the President and Chief Executive Officer of Lakewood Pathology in 2001, and a shareholder in 2003.

407839_2

35.     In five short years, Dr. Bokhari turned Lakewood Pathology into a thriving national independent pathology company providing a full range of anatomical pathology services, including surgical pathology, dermatopathology, oral pathology, cytopathology, hematopathology and molecular pathology.  During his term as the President and Chief Executive Officer until May 2007, the company grew several fold in revenue, expanded its client base in more than 25 states and created more than one-hundred new jobs in the region.  Among other things, in 2006, Lakewood Pathology was included in the "Philadelphia 100" fastest growing companies of the region.

36.     Lakewood Pathology's success from 2001 to 2006 resulted in large part from Dr. Bokhari's unique and innovative sales and management style.  During this time, Dr. Bokhari served as Lakewood Pathology's President and Chief Executive Officer. Eschewing the popular "Pharma" model of sales and marketing, which involves sending hundreds of sales representatives to cold-call doctor's offices in search of prospective clients, Dr. Bokhari grew Lakewood Pathology by personally building relationships with large potential clients through his extensive network of contacts in the industry.

37.     Lakewood Pathology's success permitted it to attract some of the top names in the industry to serve on its Board of Directors, and to manage the Company's affairs.

**B.     Water Street Purchases A Majority Interest In Lakewood Pathology**

38.     Water Street formed as an entity in 2005.  Although its website touts the individual experience of its partners in the private equity industry, Water Street's acquisition of Lakewood Pathology was its first deal.  And it showed.  At every step of its relationship with Lakewood Pathology, Water Street made costly and significant errors

12

and misjudgments which caused significant harm to the company built by Dr. Bokhari, and to Dr. Bokhari in his own right. Indeed, the Recapitalization Transaction at issue did not arise merely because of Water Street's refusal to buy into Dr. Bokhari's management strategy and leadership (which previously built Lakewood Pathology into a successful company), or the fact that Water Street could not run a functioning healthcare services company, but also because at the outset of its relationship with Lakewood Pathology, Water Street failed to put in enough capital, and burdened Lakewood Holding/Lakewood Pathology with too much debt to be able to satisfy the contractual loan covenant requirements of its primary lender. Therefore, from the very beginning, Water Street knew that Lakewood Holding/Lakewood Pathology could not meet the loan covenants imposed by its primary lender, and it could be held in default at any time. When their inexperience and mismanagement caused the company to go into financial shock, they panicked, pointed at Dr. Bokhari as a scapegoat and, as one does with a scapegoat, attempted to drive him into oblivion.

39. In 2006, Water Street engaged and employed Berg, an industry veteran, to perform due diligence respecting a prospective purchase of a controlling interest in Lakewood Pathology.

40. In or about May 2006, after completing exhaustive due-diligence, at a cost of approximately $3.5 million, Water Street, a Chicago, Illinois-based private equity firm focused on the healthcare industry, acquired a majority ownership stake in Lakewood Pathology for approximately $39 million. To fund the transaction, Water Street invested approximately $19 million of equity, and borrowed the remaining $20 million from Silver Point Capital. The amount of capital invested by Water Street was significantly

13

lower than the amount agreed upon in the parties' Letter of Intent. Instead of investing its owns capital in the amount agreed upon, Water Street caused Lakewood Holding/Lakewood Pathology to take on an additional $6 million in debt, saddling Lakewood Holding/Lakewood Pathology with a debt burden that placed the Company in almost immediate jeopardy under its credit agreement with Silver Point.

### The Stock Purchase Redemption And Contribution Agreement

41.     Water Street's acquisition was evidenced by, inter alia, a certain Stock Purchase, Redemption and Contribution Agreement dated May 18, 2006 (the "SPRCA"). (See a true and correct copy of the SPRCA is attached herewith as Exhibit "A.") Pursuant to the SPRCA, a holding company, Lakewood Holding, was formed to purchase stock from Lakewood Pathology. Also, Lakewood Pathology redeemed a portion of the stock of Lakewood Pathology owned by Dr. Bokhari, and Dr. Bokhari transferred to LHCH a portion of the remaining stock of Lakewood Pathology owned by Dr. Bokhari. Finally, Lakewood Holding transferred the stock it purchased in Lakewood Pathology to LHCH.

42.     Thus, at the closing Dr. Bokhari was to be paid certain monies for his stock, less a Closing Indebtedness Amount as defined in the SPRCA and less a $3.5 million escrow, which was executed pursuant to an escrow agreement between the parties. (SPRCA, Article 1, § 1.2 (g).).

43.     Likewise, Dr. Bokhari was entitled to certain "Earn-Out Payments" of between $5 million and $7.5 million, depending on the EBITDA of Lakewood Pathology during certain periods. For example, if Lakewood Pathology generated EBITDA of at least $7 million for the fiscal year 2006, Dr. Bokhari would be entitled to a pay-out of $5

14

million.  If Lakewood Pathology generated EBITDA of at least $14 million for the fiscal year 2007, Dr. Bokhari would be entitled to a pay-out of $7.5 million.  (SPRCA, Article 1, § 1.6 (a) – (d).).

44.     The net effect of this transaction was that (1) Lakewood Holding owned 100% of the outstanding capital stock of Lakewood Pathology; (2) Dr. Bokhari retained a 35% equity interest in Lakewood Holding; and (3) LHCH owned a 65% equity interest in Lakewood Holding.

### The Stockholders Agreement

45.     As part of the transaction, Lakewood Holding, LHCH and Dr. Bokhari executed a May 19, 2006 Stockholders Agreement.  (See May 19, 2006 Stockholders Agreement (the "Stockholders Agreement"), attached as Exhibit "B", at p. 1.)

46.     The Stockholders Agreement provides for an initial seven (7) person Board of Directors, to be composed of four (4) "Holding Representatives" designated by Water Street (who initially were Kirkpatrick, Dugan, Connelly and Berg); one (1) representative designated by Dr. Bokhari from time to time; one (1) representative designated by Dr. Bokhari from time to time, subject to the prior approval of LHCH; and, the Chief Executive Officer of Lakewood Holding (who at that time was Dr. Bokhari). (See Stockholders Agreement, Section 1.)

47.     Importantly, those designated in the Stockholders Agreement as "Holding Directors" were in fact at all times material partners in and employed by Water Street, and had a significant financial and employment interest in the success of Water Street. Their financial and employment interest in Water Street stood in direct conflict with the fiduciary duties of these Directors to Lakewood Holding and Lakewood Pathology.

15

48.   Section 7 of the Shareholder Agreement described "Additional Issuances",

and states in relevant part:

(a)  . . . [I]f the Company authorizes the issuance or sale of any equity securities or securities or instruments containing equity-like features ("Additional Securities"), each of Holding and [Dr. Bokhari] shall be entitled to purchase a portion of such Additional Securities and, in the event Holding elects to exercise such right to purchase Additional Securities, the other Stockholders shall be entitled to purchase a portion of such Additional Securities, as provided herein.

(b)  At least thirty (30) days prior to the issuance of any Additional Securities, the Company shall deliver written notice (the "Issuance Notice") to Holding, [Dr. Bokhari] and each other Stockholder (collectively the "Eligible Stockholders") specifying in reasonable detail the number and type of Additional Securities to be issued and the terms and conditions of the issuance. Each of Holding and [Dr. Bokhari] may elect to participate in the contemplated issuance by delivering written notice (the "Election Notice") to the Company and each other Stockholder of its intention to exercise its  rights hereunder within ten (10) days after receipt of the Issuance Notice from the Company.

(c)  If Holding elects to exercise its rights hereunder by delivery of an Election Notice, then each other Stockholder may also elect to participate in the contemplated issuance.  Each eligible Stockholder may participate in the contemplated issuance at the same price per Additional Security and on the same terms (including purchasing the same strip of securities being offered) by delivering written notice to the Company within twenty (20) days following delivery of the Issuance Notice specifying the maximum amount of Additional Securities which such Eligible Stockholder desires to purchase;  provided that each Eligible Stockholder purchasing Additional Securities shall pay in cash an amount equal to the fair market value of any non-cash consideration to be received for the Additional Securities (as determined in good faith by the Board).  If Holding does not elect to exercise its rights hereunder, none of the Stockholders (other than [Dr. Bokhari]) shall be entitled to any rights in connection with such issuance.

(d)  If any Eligible Stockholders have elected to purchase Additional Securities, such Additional Securities shall first be allocated among the Eligible Stockholders so electing in an amount equal to the lesser of (i) the maximum amount specified by each such Eligible Stockholder in its notice to the Company, and (ii) such Eligible Stockholder's pro rata share of Common Stock held by all Eligible Stockholders immediately prior to the issuance of Additional Securities.  If any Additional Securities remain

after giving effect to such procedure, such procedure shall be repeated until either all Additional Securities requested to be purchased by Eligible Stockholders have been so allocated or no Additional Securities remain available for purchase.

(See Stockholders Agreement, Section 7.)

### **The Credit And Guaranty Agreement**

49.    Finally, Lakewood Pathology, Lakewood Holding, and its subsidiaries (as Guarantors), entered into a May 19, 2006 Credit and Guaranty Agreement ("CGA") with Silver Point Finance, LLC ("Silver Point").  (See a true and correct copy of the CGA, attached as Exhibit "C.")

50.    The CGA provided that Silver Point would extend a credit facility to Lakewood Pathology in an amount not to exceed $30 million, consisting of a $17.5 million aggregate principal amount of "Tranche A Term Loans," $5 million aggregate principal amount of "Tranche B Term Loans," and $7.5 million aggregate principal amount of Revolving Commitments.  (CGA, p. 1.)

51.    In addition to various other "Financial Covenants," the CGA required Lakewood Pathology to maintain a certain "Leverage Ratio".  (CGA, § 6.7 (b)).  The "Leverage Ratio" is defined as:

> The ratio as of the last day of any Fiscal Quarter or other date of determination of (i) the Consolidated Total Debt as of such day, to (ii) Consolidated Adjusted EBITDA for the four Fiscal Quarter period ending on such date (or if such date of determination is not the last day of a Fiscal Quarter, for the four-Fiscal Quarters period ending as of the most recently concluded Fiscal Quarter.

(CGA, p. 21.)  The CGA required Leverage Ratios, in relevant part, as follows:

| Fiscal Quarter Ended | Leverage Ratio |
|---|---|
| September 30, 2006 | 3.15:1.00 |
| December 31, 2006 | 3.00:1.00 |
| March 31, 2007 | 3.00:1.00 |
| June 30, 2007 | 3.00:1.00 |

(CGA, § 6.7 (b)).

**<u>The Financial Advisory Agreement</u>**

52.    Moreover, as part of the transaction, Lakewood Holding entered into a

"Financial Advisory Agreement" (the "FAA") with a subsidiary of its majority owner,

Water Street Capital Management, L.P.  (See a true and correct copy of the FAA,

attached hereto as Exhibit "D.")

53.    The FAA provided that Water Street would perform services as directed

by Lakewood Holding's Board of Directors, including, but not limited to, the following:

(a)     general advisory services in relation to the Company's and its
subsidiaries', if any, management and business;

(b)      identification, analysis, support and negotiation of acquisitions
and dispositions;

(c)     Analysis, support and negotiation of financing alternatives,
including, without limitation, in connection with acquisitions, capital
expenditures and refinancings of existing indebtedness;

(d)     Finance functions, including assistance in the preparation of
financial projections; and

(e)     Strategic planning functions, including evaluating major strategic
alternatives.

(FAA, p. 1, §1).

54.    Also, as part of the FAA, Lakewood Holding agreed to pay to Water

Street a quarterly management fee and other transaction fees:

(a)  The Company shall pay to Water Street a quarterly management fee
equal to $125,000 per quarter (the "Management Fee"), plus the

18

reasonable out-of-pocket fees and expenses of Water Street or any of its affiliates incurred in connection with rendering services hereunder. The quarterly periods to which the Management Fee relates shall be the periods ending on and including each March 31, June 30, September 30 and December 31. The Management Fee relating to the quarter in which this Agreement is signed shall be pro-rated for the balance of the quarter remaining as of the date hereof. The Management Fee payable with respect to each quarter (or portion thereof) shall be paid in advance; provided, however, that the Management Fee shall accrue, without interest, until, and shall be paid upon, any termination of this Agreement. Notwithstanding any provision of this Agreement to the contrary, the parties hereto acknowledge and agree that the Board may, in its sole discretion, elect at any time to pay any accrued and unpaid fees and expenses, including the Management Fee and the Closing Fee (as hereinafte3r defined).

(b) Following the completion of the Closing, the Company shall pay to Water Street a transaction and commitment fee equal to $500,000 (the "Closing Fee"). The Closing Fee shall accrue, without interest, until, and shall be paid upon, any termination of this Agreement.

(FAA, pp. 1-2, § 2 (a) – (b)).

55.     The SPRCA, the FAA, the CGA, and the Stockholders' Agreement will hereinafter collectively be referred to as the "Transaction Documents."

As evidenced by the Transaction Documents, Dr. Bokhari's interest in Lakewood Pathology was valued by Water Street at approximately $14 million and Lakewood Pathology itself was valued by Water Street at approximately $50 million.

**C.     Disputes Arise As Water Street Undercapitalizes Lakewood and Abandons Dr. Bokhari's Successful Business Model**

56.     At the inception of the deal, Water Street failed to infuse Lakewood Holding with a minimum of $25 million of equity as contemplated and agreed upon in the Letter of Intent prior to the transaction with Silver Point. Instead, Water Street caused Lakewood Holding/ Lakewood Pathology to take on an additional $6 million in debt that Water Street should have invested as equity under the Letter of Intent. Thus,

19

almost from the beginning, Water Street knew that it would be difficult or impossible to meet the required Leverage Ratio under the Company's credit agreement. Predictably, as early as September 2006, Lakewood defaulted on its Leverage ratio requirements. In November 2006, Silver Point alerted Lakewood Holding of its default and invited Lakewood Holding/Lakewood Pathology to renegotiate the credit agreement as a condition to the willingness of Silver Point to grant a waiver of default. Water Street then immediately started to attempt to renegotiate the deal it previously made with Dr. Bokhari, and demanded that he accept a purchase price reduction of $5 million and solely pay down the Silver Point debt.

57.     In addition, although Dr. Bokhari continued to serve as the Chief Executive Officer and President of both Lakewood Holding and Lakewood Pathology, the Water Street Directors demanded wholesale changes in the Lakewood Pathology business model that had made the Company so successful. Among these changes were to switch the company's sales focus from the personalized "Legacy" business model utilized by Dr. Bokhari, in which clients were serviced on a one-to-one basis, with a "Pharma" model where Lakewood Pathology would hire many new salespeople in all regions of the United States, to cold-call the offices of doctors in search of prospective new clients. The capital outlay needed for this new business model was staggering, as the Company planned to pay extraordinary salaries to new sales associates and to new and unnecessary layers of management.

58.     Dr. Bokhari protested this new "Pharma" business plan, and gave detailed reasons why this new business model was inappropriate for the industry, in particular because the Company was not a party to regional and national payor contracts and did not

20

have a widely-recognized Chief Medical Officer/Chair of Pathology.  Dr. Bokhari's

objections displeased the Water Street Directors and Kirkpatrick.  In fact, despite

overwhelming evidence to the contrary, Kirkpatrick stated that Dr. Bokhari was not a

premium value creating CEO.

59.     The Water Street Directors also blocked Dr. Bokhari from implementing

key initiatives to support the ongoing growth of the Company, including inter alia:

> a. Granting more extensive awards under the Stock Option
> Plan to retain key employees, as proposed by Dr. Bokhari
> in July 2006;
>
> b. Hiring a nationally recognized Chief Medical
> Officer/Chair of Pathology to provide daily guidance to the
> medical staff and readily interact with the diverse and
> demanding client base of Lakewood Pathology; and
>
> c. Retaining a managed care contracting specialist to
> expand LPA payor participation regionally and nationally.

60.     Moreover, the Water Street Directors insisted that Dr. Bokhari retain Berg

as the Chief Operating Officer.

61.     Further, although Dr. Bokhari had always been involved in charitable and

political initiatives, Kirkpatrick began to complain that Dr. Bokhari was "distracted" and

"not CEO material."

62.     At the same time, Water Street began to pressure members of the

Lakewood Holding Board of Directors who were selected by Dr. Bokhari to resign in

favor of Directors selected and controlled by Water Street.  Water Street made it known

that they wanted Dr. Bokhari to place an associate of Water Street and its Partners,

Timothy Brodnik, on the Lakewood Pathology Board of Directors, instead of allowing

Dr. Bokhari to exercise his contractual right to designate certain directors.

63.     As a result of Water Street's interference and mismanagement, the rapid growth of Lakewood Pathology stalled.  For example, in 2003, Lakewood Pathology took in approximately $6 million in revenue; in 2004, Lakewood Pathology took in approximately $6.5 million in revenue; and in 2005, Lakewood Pathology took in approximately $12 million in revenue.  In 2006, Lakewood Pathology's revenue was $16.2 million, a slower growth than in previous years, and most of the revenues were captured in the first half of the year, before Water Street acquired majority control of the company.

**D.     The Parties Settle And Execute Mutual Releases**

64.     In the face of all of these disputes, and recognizing the negative effect it was casting on the Company, Dr. Bokhari decided that for the good of the Company and in order to protect his ongoing equity interest in the Company; he should settle his disputes with Water Street, even though he had strong claims against Water Street.  In a meeting with Water Street on January 10, 2007, Dr. Bokhari agreed to the following "high points" of a negotiated settlement:

> a. Take a price reduction of $3.5 million to pay down the debt to Silver Point;
>
> b. Retain Berg as the Chief Development Officer of Lakewood Pathology, who would institute the "pharma" sales model to complement the existing legacy business growth model; and
>
> c. Invest $1.5 million pro rata with Water Street to fund the capital expenditure needs of Lakewood Pathology.

This resulted in a settlement agreement and mutual release between Water Street and Dr. Bokhari that is discussed below.  As an outcome of this agreement, Silver Point

renegotiated its Credit Agreement and the 2007 Business Plan was approved by the Board of Directors in March 2007.

### The Settlement Agreement And Mutual Release

65.     On or about April 2, 2007, Dr. Bokhari and LHCH/Lakewood Holding entered into a Settlement Agreement and Mutual Release (the "SAMR"), arising from Dr. Bokhari's allegations of wrongdoing against LHCH/Water Street and LHCH's previous assertions of wrongdoing against Dr. Bokhari.  (See a true and correct copy of the SAMR, attached herewith as Exhibit "E.")

66.     The SAMR stated that the $3.5 million held in escrow pursuant to Section 1.2 (g) of the SPRCA would be released and received by Lakewood Pathology. Lakewood Pathology would then prepay a portion of the loan to Silver Point.

67.     Also, the SAMR provided that LHCH would contribute to Lakewood Holding $982,087 in cash, in exchange for 9,820 shares of Common Stock, and 8,838.783 shares of Preferred Stock.

68.     Likewise, Dr. Bokhari would and did execute a Promissory Note in the amount of $517,913, in exchange for 5,179.13 shares of Common Stock and 4,661.217 shares of Preferred Stock.  (See a true and correct copy of the April 2, 2007 Promissory Note, attached as Exhibit "F.").  In conjunction therewith, Dr. Bokhari issued a "Joint Instruction Letter" requesting that JPMorgan Chase Bank, N.A. release and distribute $3.5 million to Lakewood Holding, and the remainder to Dr. Bokhari.  (See a true and correct copy of the Joint Instruction Letter, attached as Exhibit "G.")

69.     Further, a provision was inserted with respect to certain "Underbillings" for pathology services that were noted by Dr. Bokhari.  Therefore, a provision was

23

inserted regarding collection of the Underbillings, which would be collected first to pay

off the Promissory Note, with the excess to Dr. Bokhari:

(a)  It is the Parties' understanding that Dr. Bokhari has determined that, during 2004 and 2005 and from January 1, 2006 to August 18, 2006, the Company failed to bill all allowable claims with respect to a "triple pin cocktail" staining procedure used in connection with certain prostate biopsies; more specifically, such staining procedures were billed as one or two units but should have been billed as three units.  Such underbilled staining procedures are referred to herein as the "Underbillings".  As soon as practical but in any event within 30 days after the date hereof, the Company shall deliver to Holding and Dr. Bokhari a written report (the "Underbillings Report"), which shall set forth in reasonable detail each of the Underbillings.

(b)  From the date hereof until December 31, 2007, the Company hereby agrees to follow its billing and collection procedures in the Ordinary Courts in an attempt to collect the Underbillings.  The Company shall be solely responsible for billing and attempting to collect the Underbillings, and the Company's billing and collection efforts shall be limited to customary and reasonable practices and shall be conducted in a manner which ensures there shall be no negative impact on the ongoing business of the Company, including its relationships with customers and payors.  In addition, the Company shall have no obligation, and shall have no obligation to cause its employees) to exert or pay for any additional efforts, including, without limitation, the hiring of temporary employees or the engagement of other external resources, in an attempt to collect the Underbillings; provided, however, if the Parties mutually agree to any such additional efforts, the cost and expense of such additional efforts shall reduce the amount of collected Underbillings on a dollar-for-dollar basis.  From January 1, 2008 until December 31, 2008, the Company shall respond to unsolicited inquiries from customers and payors with respect to uncollected Underbillings in the Ordinary Course.

(c)  As soon as practical but in any event within 120 days after the end of 2007 and 2008, the Company shall deliver to Holding and Dr. Bokhari a written response to the Underbillings Report, which shall set forth in reasonable detail the amount of Underbillings collected in the prior year (including the amount of any Underbillings collected prior to the date hereof.).  After completion of the audit of the Company's financial statements for the prior year … all moneys collected in the prior year with respect to the Underbillings shall be (i) retained by the Company and applied first against any accrued but unpaid interest and second against the principal outstanding under the Promissory Note until the Promissory Note is paid in full and (ii) treated as a compensatory award to Dr.

24

Bokhari. Any moneys collected in the prior year with respect to the Underbillings in excess of the principal and interest outstanding under the Promissory Note shall be (i) remitted by the Company to Dr. Bokhari and (ii) treated as a compensatory award to Dr. Bokhari.

(SAMR, § 4 (a) – (c)).

70. Also, the SAMR released all claims that existed between the parties:

5. Release of Dr. Bokhari by Holding, LHC and the Company. In further consideration of the Settlement, and as a material inducement therefor, each of Holding, LHC and the Company, on behalf of themselves and each of the other Buyer Parties (for the avoidance of doubt, the Parties hereby acknowledge and agree that the Buyer Parties including Holding, LHC, the Company, Water Street Healthcare Partners, L.P., Water Street Healthcare Management, L.P., Water Street Healthcare Partners, LLC, Timothy A. Dugan, Harreld N. Kirkpatrick, III, James Connelly, Douglas Berg, Michael Wall and Joe Sebastianelli and their respective subsidiaries, affiliates and partners, and their respective officers, directors, managers, equity holders, members and employees, and their respective predecessors, successors, assigns, heirs, representatives, agents and attorneys, but exclude the Seller Parties), do hereby release, remise and forever discharge each of the Seller Parties (for the avoidance of doubt, the Parties hereby acknowledge and agree that the Seller Parties include Dr. Bokhari and his affiliates, and his affiliates' respective officers, directors, managers, equity holders, members and employees, and their respective predecessors, successors, assigns, heirs, representatives, agents and attorneys, but exclude the Buyer Parties) from any and all causes of action, sums of money, damages, attorneys' fees, costs, losses, liabilities, accountings, claims and demands whatsoever (whether known or unknown, disclosed or undisclosed, asserted or unasserted, direct or indirect, absolute or contingent, accrued or unaccrued, and whether due or to become due, in law or equity, contract or tort or otherwise), arising from the beginning of time up to and including the date hereof, which Holding, LHC, the Company and the other Buyer Parties, as the case may be, ever had, now have or hereafter can, shall or may have against the Seller Parties, including, without limitation, for, upon or by reason of the Claims and by reason of any obligations imposed upon Dr. Bokhari under Article 8 of the Purchase Agreement; provided, however, that nothing contained herein shall be deemed to release Dr. Bokhari or the other Seller Parties, as the case may be, from (a) the terms and conditions of this Agreement, (b) Dr. Bokhari's obligation pursuant to the terms and conditions of the Purchase Agreement, to indemnify the Buyer Parties for any breach of the Seller Special Representations under Article 8 of the Purchase Agreement, or (c) any causes of action, sums of money, damages, attorneys' fees, costs, losses, liabilities, accountings, claims or

25

demands whatsoever (in law or equity, contract or tort or otherwise), arising after the date hereof, which Holding, LHC, the Company or the other Buyer Parties, as the case may be, hereafter can, shall or may have against Dr. Bokhari or the other Seller Parties.

6.  Release of Holding, LHC and the Company by Dr. Bokhari.  In further consideration of the Settlement, and as a material inducement therefor, Dr. Bokhari, on behalf of himself and each of the other Seller Parties, does hereby release, remise and forever discharge each of the Buyer Parties from any and all causes of action, sums of money, damages, attorneys' fees, costs, losses, liabilities, accountings, claims and demands whatsoever (whether known or unknown, disclosed or undisclosed, asserted or unasserted, direct or indirect, absolute or contingent, accrued or unaccrued, and whether due or to become due, in law or equity, contract or tort or otherwise), arising from the beginning of time up to and including the date hereof, which Dr. Bokhari and the other Seller Parties, as the case may be, ever had, now have or hereafter can, shall or may have against the Buyer Parties, including, without limitation, for, upon or by reason of the Claims and by reason of any obligations imposed upon any of Holding, LHC or the Company under Article 8 of the Purchase Agreement; provided, however, that nothing contained herein shall be deemed to release any of Holding, LHC, the Company or the other Buyer Parties, as the case may be, from (a) the terms and conditions of this Agreement, (b) the Company's obligation pursuant to the terms and conditions of the Purchase Agreement, to make any Earn-Out Payments to Dr. Bokhari under Section 1.6 of the Purchase Agreement, or (c) any causes of action, sums of money, damages, attorneys' fees, costs, losses, liabilities, accountings, claims or demands whatsoever (in law or equity, contract or tort or otherwise), arising after the date hereof, which Dr. Bokhari or the other Seller Parties, as the case may be, hereafter can, shall or may have against Holding, LHC, the Company or the other Buyer Parties.

(SAMR, §§ 5-6).

**E.    Removal Of Dr. Bokhari As President And CEO**

71.    Following the execution of the SAMR, Dr. Bokhari focused his attention on executing the approved 2007 Business Plan as part of the SAMR.  Water Street, on the other hand, implemented a strategy to use Dr. Bokhari as a scapegoat and force Dr. Bokhari out of Lakewood Pathology.

26

72.     For example, Berg, at the direction of Water Street, consistently failed to follow the approved 2007 Business Plan.  Dr. Bokhari on more than one occasion in April and May 2007, on his own and on the advice of Kent Herring ("Herring"), the Chief Financial Officer of Lakewood Pathology/Lakewood Holding, pointed out to Berg that he was not following the Plan.  Dr. Bokhari also conveyed his concerns to the Board of Directors during the April 26, 2007 Board of Directors' meeting.  Dr. Bokhari also conducted a conference call with Berg on May 5, 2007 to identify key problem areas and insisted that Berg follow the Business Plan.  This meeting was also attended by Herring and the then legal counsel, John Hogan, Esq.  However, the Water Street Directors, although aware of Berg's failure to follow the Business Plan, continued to approve of Berg's actions.

73.     In addition, Kirkpatrick, a Water Street employee and Chairman of the Board of Lakewood Holding, personally contacted a member of the Board of Directors, who sat on the Board of Directors at the request of Dr. Bokhari, and urged him to resign. Under pressure to resign from the controlling shareholders and Board Members of Lakewood Holding, all of whom were employed by Water Street and acting in the best interests of Water Street, rather than Lakewood Holding and its shareholders, the Board Member resigned.  (In October 2006, Kirkpatrick had also inappropriately dealt with another independent Board Member who sat on the Board of Lakewood Holding/Lakewood Pathology, by reneging on the commitments that were made to him as part of a Board compensation package.  This led to that Director's resignation in November 2006.)  All of this was consistent with Water Street's efforts to remove all independent voices from the Board.

27

74.     Thus, in or about the spring of 2007, the remaining Board Members were Kirkpatrick, Connolly and Dugan, all of whom were employed by Water Street, and Dr. Bokhari.

**The Severance Agreement**

75.     On or about May 16, 2007, under pressure from Water Street and the Water Street Directors, Dr. Bokhari and Lakewood Pathology entered into an Agreement by which Dr. Bokhari resigned as President and Chief Executive Officer.  (See a true and correct copy of the May 16, 2007 Agreement (the "Severance Agreement"), attached as Exhibit "H.")

76.     The Severance Agreement recognized that prior to its execution, Dr. Bokhari was employed as the Chief Executive Officer and President of Lakewood Pathology and Lakewood Holding.  As of May 16, 2007, pursuant to the Agreement, Dr. Bokhari resigned all officer positions with Lakewood Pathology and Lakewood Holding, and terminated his employment.  The Severance Agreement also provided that Dr. Bokhari would continue to receive benefits from the Company, and Dr. Bokhari would continue to receive his base salary from the Company until June 2008.  (Severance Agreement, p. 1.)

77.     Also, the Severance Agreement once again released all claims against Dr. Bokhari, and states in relevant part:

> GENERAL RELEASE. . . . . In consideration of the releases, covenants and other consideration set forth herein, the sufficiency of which the Company hereby acknowledges, each of the Company, LHC and [any of their respective parents, subsidiaries, affiliates or other related entities] hereby releases Dr. Bokhari from any and all claims, demands, suits, debts, loans, judgments, liens, obligations, damages, liabilities (including claims for indemnification or contribution), rights and causes of action of any nature whatsoever, known or unknown, at law or equity or otherwise,

28

including, but not limited to, claims, demands, suits, causes or rights of action relating to breach of contract or public policy, and any and all rights to or claims for attorneys fees or damages (including, but not limited to, contract, compensatory, punitive or liquidated damages) or equitable relief, which any of the Company, LHC or its successors or assigns can or shall have against him, whether known or unknown, on account of or arising out of or in any way or manner relating to, or based upon, his employment with the Company and/or LHC or his separation from such employment, or any facts, transactions, occurrences, acts or omissions, products or services thereof. The Company specifically waives the benefit of any statute or rule of law, which, if applied to this Agreement, would otherwise exclude from its binding effect any claims not now known by the Company to exist. The Company covenants not to sue any person or entity for any claim or cause of action covered by this Agreement.

(Severance Agreement, pp. 3-4.)

**F.    Water Street Continues To Mismanage Lakewood Pathology And Lakewood Holding And Destroy Dr. Bokhari's Interest**

78.    Following the execution of the Agreement, Dr. Bokhari was no longer employed by Lakewood Pathology, but maintained an approximately 33% interest in Lakewood Holding, and continued to have the ability to name two directors to the Board of Directors of Lakewood Holding.  At this time, Water Street/LHCH owned approximately 58.4% of Lakewood Holding.

79.    Also following the execution of the Agreement, Berg took over as the Chief Executive Officer of Lakewood Holding and was also installed on the Board of Directors.  As compensation for his position, Berg acquired, in his own right, a 2.6% ownership interest in Lakewood Holding.

80.    Notwithstanding, and despite the Individual Defendants' promise to Lakewood Pathology and Lakewood Holding as well as Dr. Bokhari, that Lakewood Pathology and Lakewood Holding would have an independent Director, Water Street, through its employees on the Board of Directors of Lakewood Holding, hand-picked a

longtime associate of Water Street and its partners, Brodnik, to sit on the Board of Directors at the request of Water Street. Water Street gave Brodnik 6800 shares of common stock as compensation for his agreement to sit on the Board of Directors of Lakewood Holding.

81.    Importantly, although Water Street asserted that Brodnik was a "disinterested" Director, Brodnik was appointed to the Board by Water Street, was given a sizeable Board Package by Water Street, and was in fact controlled by the other Water Street employees on the Lakewood Holding Board of Directors.

82.    Thus, in the summer of 2007, the Board of Directors of Lakewood Holding was comprised of the Water Street Directors, (1) Kip Kirkpatrick, a Water Street employee, (2) Douglas Berg, a Water Street employee, (3) James Connolly, a Water Street employee, (4) Timothy Dugan, a Water Street employee, as well as (5) Timothy Brodnik, who was appointed by Water Street, who has a history with Water Street, and who was controlled by Water Street, and (6) Dr. Bokhari.

83.    Further, the Water Street Directors completely abandoned the approved 2007 Business Plan and Dr. Bokhari's "Legacy" business model in favor of their own "Pharma" business model. Therefore, Water Street caused Lakewood Holding/Lakewood Pathology to burn its cash faster than it could bring it in by hiring a phalanx of new sales associates who did not have specific experience in the anatomical pathology industry.

84.    The Water Street Directors put into place this "Pharma" business model at an accelerated pace in complete disregard of the approved 2007 Business Plan, knowing it was doomed to failure, knowing there was no place in the budget for it, and knowing

that such activity would dramatically reduce the value of Lakewood Holding on paper. Indeed, the Water Street Directors were so intent on eviscerating Dr. Bokhari's previously successful business plan that they reassigned most of the salespeople that worked on Dr. Bokhari's "Legacy" business plan to other parts of the country, where their contacts and expertise would not be utilized. For example, John Carson, who was previously one of Lakewood Pathology's successful salespeople, was reassigned by the Water Street Directors and their management staff to focus on Midwestern states where he had no business relationships. In response, Carson simply resigned from Lakewood Pathology.

85.    Moreover, Lakewood Pathology, under the guidance of the Water Street Directors and Berg, misappropriated the capital investment of $1.5 million made under the SAMR, thereby causing further damage to Dr. Bokhari.

86.    During all of this time, Dr. Bokhari continued to serve on the Board of Lakewood Holding/Lakewood Pathology, continued to act in the best interest of Lakewood Pathology, and continued to attempt to maintain business for Lakewood Pathology, and to gain new business for Lakewood Pathology. However, he was consistently undermined in these efforts by the Water Street Directors and Water Street.

87.    All the while, Dr. Bokhari continued to encourage the Board of Directors of Lakewood Holding to create a successful business model that worked, and to continue with Lakewood Pathology's Legacy business plan. At every turn, the Board of Directors, beholden to Water Street, refused.

88.    The Water Street Directors' mismanagement was on display in an August 3, 2007 Memorandum to Lakewood Holding's Board of Directors from CEO Doug Berg,

31

which Memorandum showed the degree to which Lakewood Pathology was

underperforming in comparison to the Plan.  (See a true and correct copy of the August 3,

2007 Berg Memorandum, attached as Exhibit "I.")  The Berg Memorandum stated in

relevant part:

> Adjusted EBITDA for June was $120,868 on a budget of $255,221.  The resulting $134,353 unfavorable adjusted EBITDA variance is primarily linked to June revenue tracking $633,141 below budget.  Actual revenue for June was $1,008,681 compared to a budget of $1,641,822.  The unfavorable revenue variance is due to a 29.5% specimen shortfall to budget and a continued negative specimen mix shift as the revenue per specimen tracked at $113.99 compared to the revenue per specimen budget of $130.73.  The favorable results of June operating expenses provided an offset to the revenue performance.  Specifically, the volume shortfall contributed to a lower run rate for cost of goods sold, a $141,055 favorable variance, with open positions and targeted cost savings in SG&A expenses driving a $303,500 favorable variance, after adjusting for onetime items and charges as add backs.
>
> Although June performance was well short of plan, it was slightly favorable to our projections at our last board meeting.  In addition, our June EBITDA was sufficient to insure we did not violate a debt covenant in Q2.
>
> Year-to-date June Adjusted EBITDA finished at $1,214,386 or 31.8% below the budget of $1,784,749.  The unfavorable adjusted EBITDA variance is due to the year-to-date revenue budget miss of $1,221,829 offset by lower expense run rates than budgeted, after adjusting for onetime items and charges as add backs.  The unfavorable revenue variance is the result of a 7.9% specimen shortfall to budget and a negative specimen mix shift as the revenue budget of $129.91.  Year-to-date Cost of goods sold produced a $48,631 favorable variance linked to the volume shortfall.  SG&A expenses, net of one time charges, produced a $590,859 favorable variance due to open positions and targeted cost savings.

(See Berg Memorandum).

## G.   Silver Point Issues A Notice Of Default

89.   In August 2007, Silver Point declared Lakewood Holding in default for its

failure to meet its Leverage Ratio.  Importantly, Silver Point could have held Lakewood

Holding in default almost from the outset of its relationship with Silver Point, because

Water Street never adequately capitalized the business after it acquired control.

    90.    Silver Point's Notice of Default stated in relevant part as follows:

> As you know, we are the Administrative Agent and Lenders under the
> Credit Agreement. As you and I have previously discussed, an Event of
> Default has occurred under the terms of the Credit Agreement and
> continues to exist. Terms used herein and not otherwise defined shall
> have the meaning as set forth in the Credit Agreement.
>
> Notice is hereby given of the occurrence of an Event of Default arising
> from the following covenant violation:
>
> Section 6.7 (b) of the Credit Agreement provides that Holdings shall not
> permit the Leverage Ratio as of June 30, 2007, to exceed 5.25:1.00.
> Pursuant to the Compliance Certificate for the Fiscal Quarter ending June
> 30, 2007 provided to us by Holdings, Holdings (a) failed to include
> $269,008 in Capital Leases as Indebtedness (as provided in clause (ii) of
> the definition of "indebtedness"), which would result in a Holdings
> leverage ratio of 5.32:1.00 and (b) incorrectly added $325,000 in
> underbillings to Consolidated Adjusted EBITDA, which, in combination
> with (a) above, would result in a Holdings' Leverage Ratio of 5.93:1.00.
>
> We are still investing certain other potential covenant violations. The
> specification of the Events of Default above is not a waiver of any other
> Event of Default that may exist.

(See August 14, 2007 Notice of Default from Silver Point Finance, LLC, attached as

Exhibit "J.")

    91.    At this point, unable to sit by and watch Water Street continue to destroy

Lakewood Holding/Lakewood Pathology, and realizing that he had no meaningful voice

on the Boards that were controlled by Water Street, Dr. Bokhari resigned from the Boards

of Directors of Lakewood Holding and Lakewood Pathology.

407839_2

**H.**   **The Water Street Directors Put Into Action Their Plan To Squeeze-Out Dr. Bokhari, And Destroy His Entire Interest In Lakewood Pathology And Lakewood Holding**

92.   Upon receipt of the Notice of Default, Kirkpatrick sent a memorandum to the other Directors, stating as follows:

> On August 15, we received the attached Notice of an Event of Default under the terms of the Silver Point Credit Agreement.  The Notice indicates that the Company failed to satisfy the Leverage Ratio covenant as of June 30th.  The Leverage Ratio is the ratio of the Company's Indebtedness to Adjusted EBITDA for the LTM period.  The Leverage Ratio was not to exceed 5.25:1.00 as of June 30th.
>
> The Company delivered a Compliance Certificate to Silver Point indicating that the Company was in compliance with the Leverage Ratio. However, Silver Point identified two issues with the Certificate.  First, the Certificate failed to include as Indebtedness $269,008 in Capital Leases. Second, our calculation of Adjusted EBITDA included $325,000 from the collection of prior underbillings.
>
> The Company did mistakenly omit the Capital Leases from its calculation of Indebtedness.  The Company believes, however, that the inclusion of the underbillings in Adjusted EBITDA is appropriate under GAAP.  In any event, an Event of Default occurred, as the Leverage Ratio (including the Capital Leases) was 5.32:1.00 as of June 30th.
>
> Silver Point has indicated in initial discussions that, as a consequence of the Event of Default, the Lenders will not make additional Revolving Loans.   Silver Point has also indicated that, rather than pursue a conventional waiver, as was done earlier this year in April, it wants the Company's Indebtedness to be repaid in its entirety.   Unlike the cooperative approach they took in discussions in April, Silver Point is taking an adversarial approach in our current discussions.
>
> We intend to continue our discussions with Silver Point in an effort to obtain a waiver.  In return for granting a waiver, Silver Point will likely require: (i) payment of a waiver fee; (ii) increased pricing on Loans under the Credit Agreement; and (iii) an additional equity infusion to further reduce the amount of the Company's Indebtedness, as was the case in April.

(See August 16, 2007 Memorandum, attached as Exhibit "K.")

34

93.     Rather than fulfill their fiduciary obligation as Directors of Lakewood

Holding and Lakewood Pathology, and investigate a solution to the technical, non-

monetary default that would work to the benefit of the companies and all of the

shareholders, the Water Street Directors who controlled and dominated the Board of

Directors of Lakewood Holding saw the default as an opportunity to squeeze Dr. Bokhari

out as a shareholder of Lakewood Holding and destroy all of the value of Dr. Bokhari's

interest, while providing a windfall to Water Street.

94.     To effectuate this squeeze out, the Water Street Directors knew that they

would have to concoct a pretext to radically reduce the value of Lakewood Holding,

which Water Street had valued at approximately $50 million when it purchased the

company just over one year before.

95.     Accordingly, a meeting of the Board of Directors occurred on or about

September 21, 2007.  Present at this Board Meeting were the current members of the

Board of Directors, Douglas Berg, James Connelly, Timothy A. Dugan, Kip Kirkpatrick

and Timothy J. Brodnik.  Dr. Bokhari also attended by telephone, along with Water

Street's counsel and Herring.  (See a true and correct copy of the Board Meeting Minutes

from the September 21, 2007 Meeting ("Minutes"), attached as Exhibit "L.")

96.     The Minutes reveal that Kirkpatrick first discussed the Silver Point

situation.  The Minutes state:

> Mr. Kirkpatrick reviewed the status of discussions with Silver Point
> concerning the existing event of default under LPA's Credit Facility.  Mr.
> Kirkpatrick noted that Silver Point continues to take an aggressive position
> in its dealings with the Companies concerning the event of default and that
> Silver Point's recent action, consistent with its rights under the Credit
> Facility, to assume day-to-day control of LPA's cash accounts had
> intensified pressure to resolve the situation.   Mr. Kirkpatrick then

summarized the two alternatives Silver Point was offering LHC's stockholders:

1.  Repay $10M of the debt under the Credit Facility and guarantee an additional $5M of debt to finance near-term capital and expenditures and working capital requirements.

2.  Commit to refinance Silver Point in its entirety by a date certain in the future; and in the interim period LHC stockholders would be required to guarantee $12.5M of existing debt plus any revolving loans required to find the cash needs of LPA.

(Minutes, pp. 1-2).

97.    After noting that LPA could run out of cash in the next 1-2 months, Kirkpatrick reviewed five possible courses of action, namely (1) bankruptcy; (2) refinance Silver Point debt; (3) sale of the Companies; (4) execute a Repositioning/Restructuring Plan proposed by Dr. Bokhari; and (5) enter into a negotiated waiver and amendment of the Credit Facility involving, among other things, additional equity and/or guarantees provided by LHC's stockholders.  (Minutes, p. 2).

98.    However, although five possible courses of action were discussed, the Water Street Directors, who dominated Lakewood Holding's Board of Directors, decided only to pursue entering into a negotiated waiver, the fifth option.  Accordingly, the Water Street Directors never investigated the possibility of selling the Company or entering into a similar strategic transaction, finding other financing, or restructuring the company to maintain the credit accommodations without a radical recapitalization and destruction of Dr. Bokhari's interest in the company.  Importantly, the Water Street Directors asserted that a sale or similar strategic transaction with respect to the Company was not a practical option at that point, but appear to have taken no steps to confirm this assertion.  (Minutes, p. 2).

36

99.    Having settled on the fifth option without seriously investigating other alternatives, and in breach of their fiduciary duties, the Water Street Directors pursued their plan to squeeze-out Dr. Bokhari and eviscerate his interest in Lakewood Holding. The next step in the plan was to pursue a "valuation." The Minutes state:

> Mr. Kirkpatrick explained that an investment of new equity capital in LHC will require a re-valuation of the business. In view of the potential conflict in determining LHC's value between LHC, on the one hand, and LHC's stockholders who will be afforded the opportunity to make such an investment, on the other hand, and based on the advice of Winston & Strawn, LLC, LHC intends to retain an independent firm to provide an opinion to support the valuation implied by the proposed transaction. In light of the conflict noted above, and again based on advice of counsel, Mr. Kirkpatrick suggested that Mr. Brodnik, in his capacity as an outside director of LHC, identify and retain a firm to provide such an opinion. Following discussion and upon motion duly made and seconded, the Directors unanimously approved the following resolution:
>
> RESOLVED, that Mr. Brodnik, in his capacity as a director of LHC, be and hereby is authorized to engage an independent financial advisory firm to provide a fairness and/or valuation opinion with respect to the equity investment expected to be made in connection with the amendment and restructuring of the Credit Facility.
>
> FURTHER RESOLVED, that Mr. Brodnik is hereby authorized to execute and deliver in the name and on behalf of LHC an engagement letter or any other or any other retention agreement with such firm upon the terms and conditions Mr. Brodnik may determine to be necessary, appropriate or desirable; and
>
> FURTHER RESOLVED, that any acts and deeds done by Mr. Brodnik in entering into, executing, acknowledging or attesting any agreements, instruments or documents (and related agreements, instruments and documents), or in carrying out the terms and intentions of these resolutions, are hereby ratified, approved and confirmed.

(Minutes, p. 3).

100.    Accordingly, even the Water Street Directors realized the grave conflicts of interest inherent in their pursuit of the Recapitalization Transaction, particularly in light of the fact that they did not, and do not even claim to have, pursued any other

37

alternative that may have resulted in a sale or similar strategic transaction with respect to the Company, secured credit for Lakewood Holding and Lakewood Pathology, or otherwise solved the problem, without a radical devaluation of Dr. Bokhari's interest. Notwithstanding, the Water Street Directors, aware of their clear and direct conflict of interest, ratified Kirkpatrick's idea to re-value the business in connection with the recapitalization, and assigned Brodnik to carry out the wishes of the Water Street Directors.

101.    Importantly, Dr. Bokhari, who had guided Lakewood Pathology to great success prior to Water Street's acquisition, presented a plan to pull Lakewood Pathology out of the precarious position in which it had been placed on account of Water Street's actions. As part of the plan, Dr. Bokhari volunteered to return to Lakewood Pathology as the Executive Co-Chair of Lakewood Pathology and Lakewood Holding, to re-implement the Legacy business model, to strip out unnecessary costs, and to convince Silver Point of the inherent value of the business due to the enormous untapped market for anatomical laboratories which led Silver Point to extend credit in the first place. However, the Water Street Directors refused to even consider Dr. Bokhari's detailed plan. Instead, it was plainly evident at the meeting that the Water Street Directors had meticulously mapped out the course of action they intended to take, and reviewed it with counsel and with Brodnik, prior to the meeting.

102.    A mere eight days later, acting in bad faith, in breach of their fiduciary duties to Dr. Bokhari, and with specific intent to cement Water Street's control over Lakewood Pathology and Lakewood Holding, and to eviscerate the value of Dr. Bokhari's common stock and preferred stock in order to enhance the value of Water

38

Street's interest in Lakewood Pathology and Lakewood Holding, the Water Street Directors engineered the Recapitalization Transaction. There was no compelling justification for these actions, nor was the Recapitalization Transaction fair to Dr. Bokhari, the only holder of a significant minority interest in Lakewood Holding not affiliated with Water Street.

103.    A special Board of Directors meeting was called on October 5, 2007. At this meeting, the Water Street Directors presented and implemented their plan to squeeze-out Dr. Bokhari and destroy his interest.

### The "Presentation To The Board Of Directors"

104.    At the meeting, a "Presentation to the Board of Directors" was made by Duff & Phelps Company, purporting to address "the total enterprise valuation of the Company," but stipulating that "these materials are not intended to represent an opinion but rather to serve as discussion materials for the Board to review and as a basis upon which Duff & Phelps may render an opinion." (See Presentation to the Board of Directors, attached as Exhibit "M," p. 2.) Further, Duff & Phelps did not provide any opinion on the fairness of the contemplated transaction. (Presentation, p. 5.)

105.    As described in the presentation, the basis for the presentation was information and projections provided by senior management, which was controlled by Water Street. (Presentation, p. 7.)

106.    The first method for valuation of Lakewood Holding provided by Duff & Phelps was the "Discounted Cash Flow Analysis." To arrive at a valuation utilizing this formula, Duff & Phelps utilized the projections provided to them by senior management (controlled Water Street), and then arrived at a "Terminal EBITDA Multiple 6.0x". In

other words, Lakewood Holdings' EBITDA would be multiplied by the "Terminal EBITDA Multiple 6.0x" which, after discounts were applied, would constitute the valuation. However, the whopping "discounts" applied were between 40% and 45%, due to such factors as "Lakewood is in a distressed situation, with the company facing a liquidity crisis," Lakewood is in transition, and the current 'Legacy Business' is at significant risk." Therefore, the Discounted Cash Flow Analysis arrived at a value for Lakewood Holdings at between $11.7425 million and $14.2592 million. (Presentation, p. 12.) This amount was less than the debt of the Company.

107.    The next method of valuation was the Selected Public Company Valuation Multiples analysis. Although Duff & Phelps stated that in relevant transactions, a median EBITDA multiple of 13.5x was generally utilized in the industry, such a multiple would not be used in the valuation of Lakewood Pathology due to management projections of revenue growth in the coming years. (Presentation, p. 18.)

108.    All told, the presentation arrived at enterprise values for Lakewood Holdings ranging from $11.9 million to $14.7 million. (Presentation, p. 21.)

109.    This presentation was nothing more than a pretext for the Water Street Directors to justify their planned breach of fiduciary duty. The presentation was predicated upon forecasts and figures provided at the direction of the Water Street Directors, who had engineered the transaction that they believed would rid them forever of Dr. Bokhari.

110.    Remarkably, the Water Street Directors arranged for this purported "presentation," and cherry-picked data to be provided to the presenters to support their own, pre-ordained conclusion: that the company that Water Street had valued at

40

approximately $50 million in May 2006, Lakewood Holdings, and purchased a 65%

interest in for approximately $37 million in May 2006, had absolutely no value in

September 2007, due to the debt that Water Street took on to acquire its interest.  This

purported presentation, which was disclaimed by its presenters to not include any actual

opinion, and to not include any kind of analysis of the fairness of the underlying

transaction, is of no value whatsoever, and does not reflect the real value of the company

as of September 2007, which was, at a minimum, between $25 million and $30 million.

**The Capital Call And The Proposed Changes To The Credit Agreement**

111.    Next, as a result of this Board meeting, the Water Street Directors sent an

"Issuance Notice to Stockholders" dated October 5, 2007.  (See a true and correct copy of

the Issuance Notice to Stockholders (the "Issuance Notice"), attached as Exhibit "N.")

112.    The Issuance Notice provided in relevant part as follows:

Lakewood Holding Corp., a Delaware corporation (the "Company"), and
Lakewood Pathology Associates, Inc., a New Jersey Corporation ("LPA"),
hereby notify you of a proposed $5,000,000 equity issuance of Convertible
Preferred Stock (the "Equity Issuance") in connection with the
restructuring of LPA's credit facilities with Silver Point Finance.  This
Issuance Notice is being delivered to you in accordance with the terms of
Section 7 of the Company's Stockholders Agreement dated as of May 19,
2006 (as amended from time to time, the "Stockholders Agreement") …

The terms of the Equity Issuance are set forth in a term sheet, a copy of
which is enclosed herewith.  The proceeds of the Equity Issuance will be
used to pay principal and interest on LPA's loans under the Silver Point
Credit Agreement.

Under the terms of the Stockholders Agreement, you have the right to
participate pro rata in the Equity Issuance up to the amount of your
common stock ownership interest in the Company by delivering to the
Company written notice of your intention to so participate…

Stockholders participating in the Equity Issuance will be required to
guarantee in the aggregate $5,000,000 of LPA's indebtedness under the
Silver Point Credit Agreement.   Specifically, if you participate in the

Equity Issuance, you will be required to guarantee an amount of LPA's indebtedness equal to the amount of your investment, and you will be required to cash collateralize the amount of your guaranty or to provide a letter of credit in support of the amount of your guaranty.

Water Street Healthcare Partners, L.P., has already indicated its intention to participate in the Equity Issuance through its wholly owned subsidiary, LHC Holding, LLC, a Delaware Limited Liability Company, and to guarantee an amount of LPA's indebtedness equal to the amount of its investment. In return for its participation and guaranty, Water Street will receive customary fees, including restructuring and guaranty fees.

Please complete and sign the Election and Waiver form enclosed herewith indicating your decision whether to participate in the Equity Issuance, the maximum amount of convertible Preferred Stock you are willing to purchase. This Equity Issuance is expected to close on or prior to October 10, 2007.

(Ex. "L.")

113.    Significantly, demonstrating that the Water Street Directors were in breach of their fiduciary duties, acting with specific intent to cement the Water Street Directors' control over Lakewood Pathology and Lakewood Holding, acting with specific intent to dilute and eviscerate the value of Dr. Bokhari's common stock and preferred stock in order to enhance the value of Water Street's interest in Lakewood Pathology and Lakewood Holding, acting without compelling justification for these actions, and acting in a manner that was blatantly unfair to the primary minority shareholder of Lakewood Pathology and Lakewood Holding, Dr. Bokhari, the Issuance Notice was in direct breach of the requirements of Section 7 (b) of the Stockholders Agreement, which required inter alia that a stockholder must be given at least ten (10) days to respond to such a notice.

114.    Furthermore, attached to the Issuance Notice was a "Term Sheet, Equity Investment and Guaranty", which further described the transaction, and explained that the shares of common and preferred stock currently owned by Dr. Bokhari, which were

retained by him as part of the initial transaction by which Water Street had purchased a

controlling interest in Lakewood Holding, would become worthless after the

Recapitalization Transaction.  (See the October 5, 2007 Term Sheet, attached as Exhibit

"O.")  The Term Sheet, dated October, stated, in relevant part:

| | |
|---|---|
| Equity Investment and Guaranty: | $5.0 million equity investment and $5.0 million guaranty of Lakewood Pathology Associates, Inc.'s indebtedness under the Silver Point Credit Agreement |
| Equity Investors and Guarantors: | All Lakewood Holding Corp. stockholders shall have the right to participate pro rata based on their common stock ownership interests in a $5.0 million equity issuance.  Each participating Lakewood Holding Corp. stockholder shall be required to guarantee an amount of Lakewood Pathology Associates, Inc.'s indebtedness under the Silver Point Credit Agreement equal to the amount of his or its investment. Silver Point will require each individual investor to cash collateralize the amount of his guaranty or to provide a letter of credit in support of his guaranty. |
| Form of Equity Investment | Shares of Convertible preferred Stock. |
| Liquidation Value: | The liquidation value will be fixed at the per share purchase price set for the Convertible Preferred Stock. |
| Conversion: | Upon conversion, the shares of Convertible Preferred Stock will represent ownership of 100% of the economic value of Lakewood Pathology Associates, Inc. |
| Use of Proceeds: | The proceeds of the $5.0 million equity investment will be used to pay principal and interest on Lakewood Pathology Associates, Inc.'s loans under the Silver Point Credit Agreement. |
| Dividends: | The holders of the Convertible Preferred Stock will be entitled to receive cumulative accruing dividends at the rate of 12.0% of the Convertible Preferred Stock purchase price per annum, when, as and to the extent declared by the Board of Directors. |
| Ranking: | The Convertible Preferred Stock will rank senior to all outstanding classes and series of capital stock. |

407839_2

| Voting: | Prior to conversion, the holders of the Convertible Preferred Stock will vote on an as converted basis with the holders of Common Stock, as a single class, on all matters on which the holders of Common Stock are entitled to vote (including the election of directors). |
|---|---|
| Stock Purchase Agreement: | The Convertible Preferred Stock will be acquired pursuant to a Stock Purchase Agreement. |
| Expected Closing Date: | The closing of the equity issuance is expected to occur on or prior to October 10, 2007. |
| Conditions to Closing: | The closing of the equity issuance is subject to satisfaction of the following conditions:<br>• Approval by the Board of Directors<br>• Receipt of a fairness opinion from Duff & Phelps.<br>• Execution of a Second Amendment and Consent and Waiver to the Silver Point Credit Agreement (the term sheet for which it is attached). |

(See Term Sheet) (emphasis supplied).

115. The end result of this transaction is that due to Water Street's refusal to properly capitalize the Company upon the purchase of its interest, due to the Water Street Directors' inept management, due to the Water Street Directors' stated intent to squeeze out Dr. Bokhari from the Company, and due to a gross under-valuation of Lakewood Holding/Lakewood Pathology that was engineered by Water Street, Dr. Bokhari's ownership interest in Lakewood Holdings was now declared valueless, meaning that he could only continue to have an ownership interest in Lakewood Holdings by investing millions more in cash in a company that he did not control, and by guaranteeing an amount equal to his additional investment.

116. Further, the Water Street Directors submitted a "Summary of Proposed Changes" to the existing Credit and Guaranty Agreement Dated May 19, 2006. (See a

44

true and correct copy of the Summary of Proposed Changes ("SPC"), attached herewith

as Exhibit "P.")

117.    The SPC described the relationship that would exist with Silver Point after

the proposed recapitalization, and also described some (but not all) of the fees which the

Water Street Directors had, in breach of their fiduciary duties, awarded to Water Street

for performing the duties it was already being paid to perform pursuant to the Financial

Advisory Agreement.  The SPC provides, in relevant part:

| Capital Contributions: | A capital contribution in the amount of $5,000,000 will be made to the Company on the effective date of the Second Amendment (the "Effective Date").  $4,000,000 of this amount will be used to pay principal and interest on the Tranche A Term Loan and $1,000,000 will be used to pay principal and interest on the Revolving Loans. |
|---|---|
| Revolving Commitments: | The aggregate amount of Revolving Commitments will be kept at $7,500,000 on the Effective Date with the following conditions:<br>• Approximately $2,200,000 will be funded (or left outstanding) on the Effective Date;<br>• LPA stockholders will guaranty (the "Guaranty") outstanding amounts under the Revolving Commitments in an aggregate amount not to exceed $5,000,000 (the Guaranty Amount"); and<br>• Total Utilization of Revolving Commitments in excess of the Guaranty Amount (as reduced from time to time will be conditioned on the Company achieving a minimum Consolidated Adjusted EBITDA level as set forth below as of the end of the most recently completed fiscal quarter.  The minimum levels will be measured initially on a cumulative basis for the periods commencing on January 1, 2008 and ending on the fiscal quarters ending March 31, June 30 and September 30, 2008, and, thereafter, measured for the trailing four fiscal quarters.  The failure to achieve a minimum level at the end of any fiscal quarter shall not affect the ability to borrow above the Guaranty Amount in any subsequent fiscal quarter so long as the minimum level for the most recent fiscal quarter is satisfied. |

<table>
<tr><td></td><td>

The minimum levels are as follows:

| Fiscal Quarter Ending | |
| --- | --- |
| March 31, 2008 | $0 |
| June 30, 2008 | $0 |
| September 30, 2008 | $500,000 |
| December 31, 2008 and thereafter | $1,000 |

Any voluntary reduction of the Revolving Commitments by the Company shall reduce the Guaranty Amount on a dollar for dollar basis.  In addition, clause (i) in Section 2.2 (a) of the Existing Credit Agreement (which limits availability if cash on hand exceeds $2,500,000) shall be removed.

The Company shall have the ability to eliminate the Guaranty after any fiscal quarter if the Leverage Ratio (with Consolidated Adjusted EBITDA measured on an annualized basis for the first three fiscal quarters in 2008) is less than 4.00x.

The Company shall pay to the Sponsor in the Effective Date an up front guaranty fee in the amount of $250,000 in cash or subordinated debt or equity, or a combination thereof. Thereafter, the Company shall pay to the Sponsor an annual guaranty fee in the amount of $250,000 payable quarterly in advance, with the first payment commencing on the Effective Date …

</td></tr>
</table>

\*\*\*\*\*

| Payment of Management Fees an Expenses: | All accrued and unpaid management fees (including management fees accruing from and after June 30, 2007) through December 31, 2007 will be paid to the Sponsor on the Effective Date in cash or equity.  In addition, the deferred closing fee of $500,000 will be paid in cash or subordinated debt or equity (or a combination thereof) to the Sponsor on the Effective Date and the Sponsor's outstanding costs and expenses will be paid to the Sponsor on the Effective Date.  Effective as of January 1, 2008, the annual management fee will be increased to $625,000, and will be paid quarterly in advance, with the first payment commencing on January 1, 2008. |
| --- | --- |

46

407839_2

| Restructuring Fee: | The Company will pay the Sponsor a restructuring fee in the amount of $500,000 in cash or subordinated debt or equity (or a combination thereof on the Effective Date. |
|---|---|

(SPC, pp. 1-2.)

118.    Accordingly, that the Recapitalization Transaction was in breach of the Water Street Directors' fiduciary duties to Dr. Bokhari, and constituted a fundamentally unfair and actionably coercive transaction which threatened to extinguish Dr. Bokhari's ownership interest in relation to that of Water Street, is well described by the exorbitant fees that the Water Street Directors deemed to pay to Water Street, their employer, in exchange for purportedly negotiating this transaction with Silver Point, which Water Street was already required to do pursuant to the Financial Advisory Agreement in return for the $500,000 annual management fee Water Street had already decided to pay itself. Those exorbitant fees to the "Sponsor," Water Street, included:

    1.    A $500,000 "Restructuring Fee";

    2.    A $500,000 "Deferred Closing Fee";

    3.    A $250,000 "Up-front Guaranty Fee";

    4.    An annual $250,000 "Guaranty Fee"; and

    5.    An annual $125,000 increase in the "Management Fee" pursuant to the Financial Advisory Agreement.

119.    Further, and by way of example, assuming that this new credit accommodation lasts five years, the Water Street Directors will have paid Water Street, for performing the duties it was already required to perform pursuant to the Financial Advisory Agreement, a whopping $2,500,000 (consisting of $1,250,000 in additional "Guaranty Fees"; $625,000 in additional "Management Fees" over and above the

47

$500,000 per year Water Street received; and $1 million in up front Restructuring and Closing Fees). By contrast, Dr. Bokhari was asked to put his cash money and guarantee up front, with no "Guaranty Fees" or any other kind of remuneration specified, and without any control over the company. This coercive, "heads, I win, tails, you lose" kind of transaction presented Dr. Bokhari with a Hobson's choice – either he could re-invest in Lakewood Holding, as if he had never had an ownership stake in the company, or he could lose his entire interest. Either way, Water Street would have a windfall.

120.    Moreover, this new credit accommodation, depending on the length it was in place, could pay Water Street back for the entire amount of its additional investment, effectively eviscerating and diluting Dr. Bokhari's interest at no expense to Water Street, because it would simply be paid cash back out from Lakewood Holdings to destroy Dr. Bokhari's interest.

121.    In response, and because the Notice of Issuance failed to provide sufficient information upon which a decision could be based, as required by law and by the Stockholders Agreement, Dr. Bokhari's counsel inquired, among other things, as to whether the restructuring and fee would be available to Dr. Bokhari if he chose to participate. Water Street's counsel advised that "the restructuring fee will be payable solely to [Water Street] in consideration of its efforts in negotiating and arranging the restructuring of the Credit Agreement." (See October 8, 2007 email string, attached as Exhibit "Q.") In addition, although it did not appear in the initial proposal that Dr. Bokhari would be entitled to guaranty fees, Water Street, when pressed, conceded that Dr. Bokhari could be eligible for guaranty fees.

122.   Dr. Bokhari's counsel also inquired as to the basis for the increase in the management fees, particularly at a time when Lakewood Holding was under tremendous financial pressure.  Water Street's counsel replied that the "current annual management fee represents 2.5% of [Water Street's] total investment in the company."  (Ex. "Q.")

123.   Of course, this attempt to justify these exorbitant fees, which will ultimately cover the cost of the Recapitalization Transaction for Water Street, as well as the evisceration of Dr. Bokhari's interest through outrageous dilution and squeeze-out of Dr. Bokhari from the company, as a reward for Water Street's "efforts in negotiating and arranging for the restructuring," utterly ignores the fact that, as officers and directors of Lakewood Holding and Lakewood Pathology, both the Water Street Directors and Water Street owed a fiduciary duty to act, and Water Street was  already the beneficiary of an existing "Financial Advisory Agreement," whereby Water Street was already receiving exorbitant fees for "analysis, support and negotiation of financing alternatives, including, without limitation … refinancing of existing indebtedness."

124.   Further, Water Street's admission that the additional management fee tacked on to the Recapitalization Transaction was tied to Water Street's investment is of enormous import, because these increased management fees constitute nothing more than a preferential return on Water Street's investment.  Of course, Water Street failed to mention this in its initial description of the transaction.

125.   Next, the Water Street Directors held an October 9, 2007 meeting, at which they purported to receive an oral "fairness opinion" relating to the proposed Recapitalization Transaction.  Once again, the information upon which the opinion was based was provided by the Water Street Directors, with the conclusion of the opinion pre-

49

ordained.  At this meeting, without a formal vote of all shareholders, the Water Street

Directors agreed to engage in the Recapitalization Transaction.

126.    In response to this proposed transaction, Dr. Bokhari sent an October 10,

2007 letter to Water Street's counsel protesting the proposed recapitalization, which was

unfairly coercive, in violation of the Stockholders Agreement, and a breach of the Water

Street Directors' duties to Dr. Bokhari.  (See a true and correct copy of Dr. Bokhari's

letter, attached as Exhibit "R.")  Dr. Bokhari's letter states in relevant part:

> Under the terms of our financial agreements, as you know, I am not
> obligated to respond to the Notice of Issuance until I have sufficient
> information upon which to base a decision and ten (10) days have expired.
> Although the information you did send me is woefully inaccurate and
> although the ten days have not yet elapsed, in order not to jeopardize the
> operations of the company, I am advising you that I will not participate in
> your proposed capital infusion.
>
> As I have advised you over and over again, as a board member, owner and
> officer, the decisions that have been made by Water Street in connection
> with the operation of LPA and this transaction have not been in the best
> interest of LPA.  In truth, it is my belief decisions were, and are, being
> made solely for the benefit of Water Street.  In addition, in reviewing the
> limited materials you did send me, it is clear that this "capital call" is
> nothing more than poorly-veiled attempt to squeeze me out of the
> company in the most inappropriate manner.   Accordingly, I have
> forwarded this matter to counsel to commence whatever legal proceedings
> are necessary in order to protect my position against Water Street and its
> principals.

(Ex. "R.")

127.    On October 11, 2007, Water Street's counsel sent a letter to Dr. Bokhari

further explaining the Recapitalization Transaction that Dr. Bokhari was powerless to

prevent.  (See October 11, 2007 letter, attached as Exhibit "S.")  The letter stated:

> I wanted to update you on the proposed capital infusion into LPA.  It now
> appears that Silver Point will consent to certain fees in connection with the
> transaction.   Specifically, Silver Point will consent to the payment of
> guaranty fees of $250,000 payable at closing and $500,000 per annum for

50

so long as the guarantees remain in place. The fees will not be paid in cash, but will take the form of a subordinated note payable after satisfaction in full of all Silver Point debt. In addition, Silver Point will consent to an increase in the management fee payable to Water Street from $500,000 per annum to $625,000 per annum. This increase is in line with the additional equity proposed to be invested by Water Street (resulting in a total fee equal to approximately $2.5% of invested capital). In addition, management fees accrued to the date of closing, as well as the $500,000 fee payable to Water Street relating to the May 2006 transaction currently accrued on the LPA's balance sheet, will be paid to Water Street in the form of a subordinated note. Again, no payment will be made on this note until satisfaction in full of all Silver Point debt.

I would appreciate you confirming, after consideration of the changes in terms described above, whether you will participate in the proposed investment. In considering these changes, you should assume that you would receive your pro rata share of any guaranty fees but would not receive any management fees.

It is understood that should you confirm your decision not to participate, that confirmation will be made subject to the objections raised in your correspondence of October 10, 2007 to Matt Bergman.

(Ex. "S.")

128.    In addition, even though Dr. Bokhari was entitled under the Stockholders

Agreement to ten (10) days to review the proposed transaction, Water Street placed

severe pressure on Dr. Bokhari to respond in less than ten days, stating that Silver Point

would foreclose and take the entire company if action was not taken immediately.

129.    Shortly thereafter, the Recapitalization Transaction was consummated,

with Water Street appropriating Dr. Bokhari's entire interest in Lakewood Holding and

Lakewood Pathology, and receiving the exorbitant transaction fees as discussed above.

130.    Dr. Bokhari has learned that the true motivation for all of the conduct

described above was for Water Street to be able to sell the company without Dr.

Bokhari's involvement or benefit. Not surprisingly, it is anticipated that Water Street

will be able to sell Lakewood Holding/Lakewood Pathology for over $35 million, less

51

than one month after declaring Lakewood Holding/Lakewood Pathology valueless for purposes of the Recapitalization Transaction, to destroy Dr. Bokhari's interest, and to squeeze him out of the company.

131.    Clearly, there was no compelling justification for the actions of the Water Street Directors and Water Street/LHCH, the controlling shareholder, nor was the Recapitalization Transaction fair to the primary minority shareholder, Dr. Bokhari.  In effectuating the Recapitalization Transaction, the Water Street Directors and Water Street/LHCH were not acting in good faith, were not acting with the honest belief that the actions were in the best interest of Lakewood Pathology or Lakewood Holdings, or the primary minority shareholder Dr. Bokhari, wholly disregarded the best interest of Lakewood Pathology and Lakewood Holdings, and acted disloyally to Dr. Bokhari and solely for the benefit of the controlling shareholder, Water Street/LHCH.

## FIRST CAUSE OF ACTION
### (Against Lakewood Holding, The Water Street Directors And Water Street) Direct Claim: Breach of Fiduciary Duty And Lack Of Entire Fairness – For Damages

132.    Dr. Bokhari incorporates by reference all of the foregoing allegations as though fully set forth herein.

133.    The Water Street Directors and Water Street, by reason of their majority stock ownership of Lakewood Holding and Lakewood Pathology and their control over the Board of Directors of Lakewood Holding and Lakewood Pathology, as well as its officers, agents and attorneys, owed and continue to owe the Plaintiff, Dr. Bokhari, fiduciary duties of loyalty, fairness, good faith and due care.

134.    The Recapitalization Transaction, implemented by the Water Street Directors and controlling stockholder Water Street, was a self-dealing transaction

effectuated by a controlling stockholder that stood on both sides of the transaction. As such, the Defendants must establish the entire fairness of the transaction.

135.    The Recapitalization Transaction was an unfair and self-dealing transaction which greatly prejudiced a minority shareholder, Dr. Bokhari, by extracting and eradicating both his voting interest and the value of his interest, to provide a windfall for the majority shareholder that controlled the Board of Directors of Lakewood Holding, Water Street. Accordingly, the Recapitalization Transaction constitutes a breach of the duties owed to Dr. Bokhari, and the Defendants cannot establish that the Recapitalization Transaction was fair. To the contrary, the Recapitalization Transaction was wholly unfair.

136.    Furthermore, the Recapitalization Transaction, by granting extraordinary management and transaction fees to Water Street based upon and tied to their capital investment, boldly and unfairly grants a preferential return on the investment to Water Street, which was not made available to Dr. Bokhari. This is yet a further breach of fiduciary duty, and makes the transaction even more unfair.

137.    Also, the Water Street Directors and Water Street plainly refused to adhere to the procedures required by Section 7 of the Stockholders Agreement by, inter alia, failing to provide the requisite response time for the issuance of additional securities. This is a yet another breach of fiduciary duty, and makes the Recapitalization Transaction plainly unfair.

138.    As a direct and proximate result of the foregoing unfair and self-dealing Recapitalization Transaction by the Defendants, Lakewood Holding, the Water Street Directors and Water Street, Plaintiff, Dr. Bokhari, suffered direct and unique losses

manifested by both cash value and voting power destruction of his interest in Water Street. While the self-dealing transactions extracted and eviscerated both the value of Dr. Bokhari's interest in Water Street and his voting power, Water Street and the Water Street Directors received a corresponding increase in control over Lakewood Holding, as well as an increase in value and exorbitant transaction, guaranty and management fees. The destruction of Dr. Bokhari's interest was predicated upon a sham valuation that permitted the Water Street Defendants and Water Street to completely devalue Dr. Bokhari's interest and squeeze him out of the company he founded. Moreover, the true value of Dr. Bokhari's interest would remain at approximately $14 million had the defendants fulfilled their fiduciary obligations.

139. Thus, Plaintiff, Dr. Bokhari, a minority shareholder of Lakewood Holding and Lakewood Pathology, has direct claims against Lakewood Holding and Lakewood Pathology, the Water Street Defendants, and Water Street/LHCH (as controlling shareholder). The controlling shareholder manipulated the corporate processes to engineer a dilutive transaction, unfairly extracting equity ownership and voting power from Dr. Bokhari, a minority shareholder, and redistributing that equity ownership and voting power to the controlling shareholder. This has caused unique and direct harm to Dr. Bokhari, entitling him to bring a direct claim against the Defendants.

140. Plaintiff, Dr. Bokhari, demands compensatory damages to recoup the fair value of the interest that was taken from him. Dr. Bokhari is entitled to the entire value of his 33% interest in Lakewood Holdings had the Water Street Directors not breached their fiduciary duties through the Recapitalization Transaction. Dr. Bokhari's remaining interest was valued at approximately $14 million in May 2006, and that valuation remains

407839_2

appropriate. Moreover, based on the bad faith of the Defendants, Dr. Bokhari is entitled

to an award of attorney's fees and costs, as well as punitive damages.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable

Court grant judgment in his favor and against Defendants as follows:

(a) Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(b) Declaring that the Water Street Directors and Water Street have breached their fiduciary duties of loyalty, fairness, good faith and due care to Dr. Bokhari;

(c) Awarding compensatory damages against the Water Street Directors and Water Street, individually and severally, in an amount to be determined at trial, including without limitation, compensatory damages for the self-dealing actions taken by the Water Street Directors and Water Street that destroyed the cash value and voting power of Dr. Bokhari's interest in Lakewood Holding Corp. and Lakewood Pathology, Inc., together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

(d) Awarding exemplary or punitive damages in favor of Plaintiff and against all Defendants;

(e) Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.

## SECOND CAUSE OF ACTION
### (Against Lakewood Holding, The Water Street Directors And Water Street) Direct Claim: Breach of Fiduciary Duty – Coercion -- For Damages

141.    Dr. Bokhari incorporates by reference all of the foregoing allegations as

though fully set forth herein.

142.    The Water Street Directors and Water Street, by reason of their majority

stock ownership of Lakewood Holding and Lakewood Pathology and their control over

the Board of Directors of Lakewood Holding and Lakewood Pathology, as well as its

officers, agents and attorneys, owed and continue to owe the Plaintiff, Dr. Bokhari,

fiduciary duties of loyalty, fairness, good faith and due care.

143.    The Recapitalization Transaction, implemented by the Water Street

Directors and controlling stockholder Water Street, was an unlawfully coercive

transaction effectuated by a controlling stockholder, which stood on both sides of the

transaction, whereby the controlling shareholder manipulated the corporate machinery to

engineer a transaction that eviscerated the equity ownership and voting power of minority

shareholder Dr. Bokhari, and redistributed that voting power and equity ownership to the

controlling shareholder that stood on both sides of the transaction.  In the process, the

controlling shareholder granted itself lavish and inappropriate transaction, guarantee and

management fees.  Further, the Water Street Directors' decision to engage in the

Recapitalization Transaction unfairly impacted and strong-armed Dr. Bokhari, for

reasons outside of the economic merit of the transaction, to either engage in the

transaction or lose his entire interest – a choice between a new position and a

compromised position for reasons other than the economic merits of the transaction.  The

transaction also deprived Dr. Bokhari of rights and value to the express benefit and

enrichment of a majority and/or controlling shareholder, Water Street.  All of which

unfairly benefited the majority shareholder, caused a direct and disproportionate harm to

Dr. Bokhari, constitutes an actionably coercive transaction, and constitutes a breach of

fiduciary duty by the Water Street Directors and Water Street.

144.    As a direct and proximate result of the foregoing unlawfully and

actionably coercive behavior, Plaintiff, Dr. Bokhari, suffered direct and unique losses

manifested by both cash value and voting power destruction of his interest in Water Street.

145.   Thus, Plaintiff, Dr. Bokhari, a minority shareholder of Lakewood Holding and Lakewood Pathology, has direct claims against Lakewood Holding and Lakewood Pathology, the Water Street Defendants, and Water Street/LHCH (as controlling shareholder).

146.   Plaintiff, Dr. Bokhari, has incurred damages as a result of the Defendants' breaches of their duties of loyalty and care.

147.   Dr. Bokhari demands compensatory damages to recoup the fair value of the interest that was taken from him.  Dr. Bokhari is entitled to the entire value of his 33% interest in Lakewood Holdings had the Water Street Directors not breached their fiduciary duties through the Recapitalization Transaction.  Dr. Bokhari's remaining interest was valued at approximately $14 million in May 2006, and that valuation remains appropriate.  Moreover, based on the bad faith of the Defendants, Dr. Bokhari is entitled to an award of attorney's fees and costs, as well as punitive damages.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable Court grant judgment in his favor and against Defendants as follows:

(a)   Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(b)   Declaring that the Water Street Directors and Water Street have breached their fiduciary duties of loyalty, fairness, good faith and due care to Dr. Bokhari;

(c)   Awarding compensatory damages against the Water Street Directors and Water Street, individually and severally, in an amount to be determined at trial, including without limitation,

57

compensatory damages for the self-dealing actions taken by the
Water Street Directors and Water Street that destroyed the cash
value and voting power of Dr. Bokhari's interest in Lakewood
Holding Corp. and Lakewood Pathology, Inc., together with pre-
judgment and post-judgment interest at the maximum rate allowed
by law;

(d)    Awarding exemplary or punitive damages in favor of Plaintiff and
against all Defendants;

(e)    Granting Plaintiff, Dr. Bokhari, such other and further relief as this
Court may deem just, proper and equitable.

## THIRD CAUSE OF ACTION
### (Against Water Street)
**Direct Claim: Aiding And Abetting Breach Of Fiduciary Duties -- For Damages**

148.    Dr. Bokhari incorporates by reference all of the foregoing allegations as
though fully set forth herein.

149.    To the extent that Water Street did not or does not owe fiduciary duties to
Dr. Bokhari as minority stockholder of the Company as members and/or affiliates of a
group of controlling stockholders, Water Street aided and abetted the breaches of
fiduciary duty by the Water Street Directors.

150.    The Water Street Directors owed and continue to owe the Plaintiff, Dr.
Bokhari, a minority shareholder, fiduciary duties of loyalty, fairness, good faith and due
care.

151.    Water Street controlled and dominated the Water Street Directors due to
Water Street's employment of them, their intertwined financial dealings, and their close
interpersonal relationships.

152.    Specifically, Water Street knew that the unfair and self-dealing
Recapitalization Transaction by the Water Street Defendants and Lakewood
Holding/Lakewood Pathology would cause Plaintiff, Dr. Bokhari, to suffer losses

58

manifested by both value and voting power destruction of his interest in Lakewood

Holding/Lakewood Pathology, in an amount that far exceeded any dilution that would

have occurred had the Water Street Directors acted in accordance with their fiduciary

duties, while providing Water Street with a windfall at Dr. Bokhari's expense.  Water

Street knew that effectuating the Recapitalization Transaction would constitute a breach

the Water Street Directors' fiduciary duties to Dr. Bokhari.

     153.    Nevertheless, Water Street knowingly participated in and facilitated the

breaches of fiduciary duty by the Water Street Directors by endorsing, approving and

accepting the benefits of the Recapitalization Transaction, which could not have been

effectuated without its active participation and express approval and authorization.

     154.    As a result of the conduct of Water Street, Plaintiff, Dr. Bokhari, has

suffered damages in an amount to be determined at trial.

     WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable

Court grant judgment in his favor and against Defendants as follows:

    (a)    Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in
this action, including reasonable allowance of fees for Plaintiff's
attorneys, accountants, and experts, and reimbursement of
Plaintiff's expenses;

    (b)    Declaring that the Water Street Directors and Water Street have
breached their fiduciary duties of loyalty, fairness, good faith and
due care to Dr. Bokhari;

    (c)    Awarding compensatory damages against the Water Street
Directors and Water Street, individually and severally, in an
amount to be determined at trial, including without limitation,
compensatory damages for the self-dealing actions taken by the
Water Street Directors and Water Street that destroyed the cash
value and voting power of Dr. Bokhari's interest in Lakewood
Holding Corp. and Lakewood Pathology, Inc., together with pre-
judgment and post-judgment interest at the maximum rate allowed
by law;

(d)     Awarding exemplary or punitive damages in favor of Plaintiff and against all Defendants;

(e)     Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.

### FOURTH CAUSE OF ACTION
**(Against The Water Street Defendants And Water Street)**
**Direct Claim: Unjust Enrichment -- For Damages**

155.    Dr. Bokhari incorporates by reference all of the foregoing allegations as though fully set forth herein.

156.    By virtue of the control and influence exerted by the Water Street Defendants and Water Street over Lakewood Holding and its Board of Directors, and consequently over the execution of the Recapitalization Transaction, the Water Street Defendants and Water Street wrongfully and unjustly obtained benefits from the Recapitalization Transaction to which they were not entitled, both in the form of the destruction of Dr. Bokhari's equity and voting interest to their corresponding benefit, as well as the exorbitant and excessive guaranty fees, transaction fees and other fees promised to Water Street.

157.    The unjust enrichment of the Water Street Directors and Water Street was obtained by virtue of their joint determination and agreement to squeeze out Dr. Bokhari, destroy his equitable and voting interest in Lakewood Holding, and reap the benefits for themselves, all the while paying themselves exorbitant transaction fees to do so.  This resulted in an unjust loss to Dr. Bokhari and a corresponding windfall to Water Street and the Water Street Directors.

60

407839_2

158.   The Water Street Directors and Water Street owed fiduciary obligations to Dr. Bokhari, yet accepted and ratified the transaction that destroyed his voting and equitable interest, in breach of those fiduciary duties.

159.   The unjust retention of these benefits by the Water Street Defendants and Water Street runs contrary to fundamental principles of justice, equity and good conscience.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable Court grant judgment in his favor and against Defendants as follows:

(a)   Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(b)   Declaring that the Water Street Directors and Water Street have breached their fiduciary duties of loyalty, fairness, good faith and due care to Dr. Bokhari;

(c)   Awarding compensatory damages against the Water Street Directors and Water Street, individually and severally, in an amount to be determined at trial, including without limitation, compensatory damages for the self-dealing actions taken by the Water Street Directors and Water Street that destroyed the cash value and voting power of Dr. Bokhari's interest in Lakewood Holding Corp. and Lakewood Pathology, Inc., together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

(d)   Awarding exemplary or punitive damages in favor of Plaintiff and against all Defendants;

(e)   Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.

## FIFTH CAUSE OF ACTION
### (Against Lakewood Holding, Lakewood Pathology And Water Street)
### Direct Claim: Breach Of Contract -- For Equitable Relief and Damages

160.    Dr. Bokhari incorporates by reference all of the foregoing allegations as though fully set forth herein.

161.    Dr. Bokhari has performed all obligations required of him pursuant to the SAMR and the Promissory Note, except as to those obligations for which he has been released or otherwise discharged.

162.    Pursuant to Section 4(a) – (c) of the SAMR, Lakewood Pathology was required and obligated to collect the Underbillings for the benefit of Dr. Bokhari.

163.    The first $517,913 of Underbillings collected by Lakewood Holding, Lakewood Pathology and Water Street were to be applied towards the Promissory Note Dr. Bokhari executed in conjunction with the SAMR.

164.    Upon information and belief, Lakewood Holding, Lakewood Pathology and Water Street has collected at least $517,913 in Underbillings.

165.    However, Lakewood Holding, Lakewood Pathology and Water Street have failed and refused to mark Dr. Bokhari's Promissory Note satisfied.

166.    Dr. Bokhari has been injured as a result of the breach of the SAMR and Promissory Note by Lakewood Holding, Lakewood Pathology and Water Street, and is therefore entitled to recover damages from Lakewood Holding, Lakewood Pathology and Water Street in an amount to be determined at trial.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable Court grant judgment in his favor and against Defendants as follows:

62

(a) Declaring that the Promissory Note has been paid in full and cancelling any indebtedness thereon;

(b) Awarding compensatory damages, together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

(c) Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(d) Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.

## SIXTH CAUSE OF ACTION
**(Against Lakewood Holding, Lakewood Pathology And Water Street)**
**Direct Claim: Anticipatory Breach Of Contract -- For Damages**

167.    Dr. Bokhari incorporates by reference all of the foregoing allegations as though fully set forth herein.

168.    Upon information and belief, Lakewood Holding, Lakewood Pathology and Water Street has collected in excess of $517,913 of Underbillings.

169.    Lakewood Holding, Lakewood Pathology and Water Street, by its actions as described herein and as further described in the Seventh and Eighth Claims below, have unequivocally refused to make the payments due to him under Section 4 (a) – (c) of the SAMR.

170.    Dr. Bokhari has been injured as a result of the anticipatory breach of the SAMR and Promissory Note by Lakewood Holding, Lakewood Pathology and Water Street, and is therefore entitled to recover damages from Lakewood Holding, Lakewood Pathology and Water Street in an amount to be determined at trial.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable Court grant judgment in his favor as follows:

407839_2

(a)    Awarding compensatory damages, together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

(b)    Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(c)    Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.

### SEVENTH CAUSE OF ACTION
### (Against Lakewood Pathology)
### Direct Claim: Breach Of Contract -- For Damages

171.    Dr. Bokhari incorporates by reference all of the foregoing allegations as though fully set forth herein.

172.    As set forth above, the Severance Agreement provided that, notwithstanding his termination, Dr. Bokhari would continue to receive benefits from the Company, including his salary and, among other things, medical benefits until June 2008. (Severance Agreement, p. 1.)

173.    Dr. Bokhari has performed all obligations required of him pursuant to the Severance Agreement, except as to those obligations for which he has been released or otherwise discharged.

174.    On or about November 26, 2007, Dr. Bokhari was advised that Lakewood Pathology had terminated his medical benefits.

175.    Dr. Bokhari has been injured as a result of the breach of the Severance Agreement by Lakewood Pathology in that he has been forced to obtain medical coverage at significant personal cost.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable Court grant judgment in his favor as follows:

407839_2

(a)     Awarding compensatory damages, together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

(b)     Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(c)     Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.

### EIGHTH CAUSE OF ACTION
#### (Against Lakewood Pathology)
**Direct Claim: Anticipatory Breach Of Contract -- For Damages**

176.    Dr. Bokhari incorporates by reference all of the foregoing allegations as though fully set forth herein.

177.    In an attempt to force Dr. Bokhari to renounce any and all claims against the Defendants based upon the fraudulent Recapitalization Transaction, Lakewood Pathology withheld the salary payment due to Dr. Bokhari on Friday, November 16, 2007 until November 20, 2007.

178.    Lakewood Pathology, by its actions as described herein has unequivocally refused to make any further payments due to Dr. Bokhari him under terms of the Severance Agreement.

179.    Dr. Bokhari has been injured as a result of the anticipatory breach of the Severance Agreement by Lakewood Pathology in an amount to be determined at trial.

WHEREFORE, Plaintiff, Dr. Bokhari, respectfully requests that this Honorable Court grant judgment in his favor as follows:

(a)     Awarding compensatory damages, together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

65

407839_2

(b)     Awarding Plaintiff, Dr. Bokhari, his costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, accountants, and experts, and reimbursement of Plaintiff's expenses;

(c)     Granting Plaintiff, Dr. Bokhari, such other and further relief as this Court may deem just, proper and equitable.


Respectfully Submitted,

SPECTOR GADON & ROSEN, P.C.



BY:          SIS88/AJD3101
             Suzanne Ilene Schiller, Esquire
             Andrew J. DeFalco, Esquire
             1635 Market Street, 7th Floor
             Philadelphia, PA  19103
             (215) 241-8888 / FAX- (215) 241-8844

             Attorneys for Plaintiff
             Syed Raza Bokhari, M.D., M.B.A.

66